## M. WITMARK & SONS v. PASTIME AMUSEMENT CO.

(District Court, E. D. South Carolina.   May 13, 1924.)

No. 252.

1. **Copyrights ☞7—Song held not dramatic composition.**

Song, "Kiss Me Again," *held* not a dramatic composition as it stands, though Copyright Act (Act March 4, 1909, § 1 [Comp. St. § 9517]) gives copyright owner right to dramatize a nondramatic work.

2. **Copyrights ☞47—Held only partially assigned.**

Where owner of copyright granted right to nondramatic renditions only for few years from first publication, he did not part with all interest in copyright, and could sue for infringement.

3. **Copyrights ☞44—Partial assignment unauthorized.**

A copyright is an indivisible thing, and cannot be split up and partially assigned, either as to time, place, or particular rights or privileges, less than sum of all rights comprehended, though exclusive rights may be granted, limited as to time, place, or extent of privileges.

4. **Copyrights ☞40—Publication held not abandonment.**

Publication of song, with notice, as preliminary step, required by Copyright Act March 4, 1909, § 9 (Comp. St. § 9530), before depositing copies with register and obtaining certificate could not be deemed an abandonment of claim to copyright.

5. **Copyrights ☞77—Employer of musician responsible.**

One who employs a musician to perform exhibition for profit, under contract by which musician has authority to play whatever compositions are, in accordance with her judgment, appropriate and fitting, must be held responsible for all that is done by musician, including performance of copyrighted compositions.

6. **Copyrights ☞66—Playing music at motion picture show "performance."**

Playing of music at motion picture show is "performance" of musical compositions for profit, under Copyright Act March 4, 1909, § 1 (Comp. St. § 9517), though music was only incidental to pictures.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Performance.]

7. **Copyrights ☞66—Playing chorus held infringement.**

The playing of merely the chorus of a copyrighted musical composition constitutes infringement.

8. **Monopolies ☞21—Party to monopoly may protect copyright from infringement.**

That one is party to interstate monopoly in violation of Sherman Anti-Trust Act (Comp. St. § 8820 et seq.) does not divest him of right to sue for infringement of copyright.

9. **Monopolies ☞21—Illegality cannot be tested collaterally.**

Illegality of combinations in restraint of trade cannot be tested collaterally under Sherman Anti-Trust Act (Comp. St. § 8820 et seq.).

10. **Copyrights ☞87—Damages allowable.**

Copyright Act March 4, 1909, § 25, subd. (b), pars. 1–14 (Comp. St. § 9546), may be resorted to by court in cases to which these paragraphs respectively apply in assessing such damages as may appear just, but court must in all cases assess damages at not less than $250 nor more than $5,000, except where other specific provision is made in subdivision (b).

11. **Copyrights ☞90—Allowance of attorney's fee discretionary.**

Under Copyright Act March 4, 1909, § 40 (Comp. St. § 9561), allowance of an attorney's fee in infringement case rests in discretion of court.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

12. **Copyrights ⬤�longrightarrow90—Attorney's fee allowed.**
   Where infringement consisted of a single playing of musical composition, defendant was required to pay an attorney's fee of $100, where plaintiff, in prosecution of suit met with an able and vigorous defense at every point.

13. **Copyrights ⬤⟶90—Statute. as to costs mandatory.**
   Copyright Act March 4, 1909, § 40 (Comp. St. § 9561), is mandatory, and full costs must be allowed plaintiff, prevailing in infringement case.

14. **Copyrights ⬤⟶90—Plaintiff entitled to reasonable fee to special master.**
   Plaintiff prevailing in infringement suit is entitled to reasonable fee for special master.

In Equity. Suit by M. Witmark & Sons against the Pastime Amusement Company. Decree for plaintiff.

J. N. Nathans, of Charleston, S. C., and William E. Arnaud, of Atlanta, Ga., for plaintiff.

M. Rutledge Rivers, of Charleston, S. C., and George P. Aarons and I. Emanuel Sauder, both of Philadelphia, Pa. (Hagood, Rivers & Young, of Charleston, S. C., on the brief), for defendant.

ERNEST F. COCHRAN, District Judge. The plaintiff, a New York corporation, sues the defendant, a South Carolina corporation, for infringement of a copyright of a musical composition entitled "Kiss Me Again." This song was composed by Henry Blossom, and the music by Victor Herbert, and their rights were duly assigned to plaintiff. It was written on the theme of "If I Were on the Stage," from the comic opera "Mlle. Modiste," and was published by the plaintiff "as sung by Miss Fritzi Scheff." (This song is not to be confused with a humorous song called "Kiss Me Again, I Like It," which many years ago achieved some degree of popularity, for, while there is apparently some similarity in the title and subject-matter, the two compositions are entirely different.) On April 16, 1915, the plaintiff copyrighted this composition by publishing it with the following notice on the first page of the publication, to wit, "Copyrighted MCMXV by M. Witmark & Sons," and by depositing on the 17th of April, 1915, in the office of the Register of Copyrights two complete copies, accompanied by claim of copyright, and a certificate of copyright register was thereupon issued by the Register of Copyrights.

Prior to the time of the alleged infringement the plaintiff executed to the American Society of Composers, Authors, and Publishers (called "the Performing Rights Society") what is termed an assignment of performing rights, whereby it sold and transferred to "the Performing Rights Society," from the date of the instrument until January 1, 1926, the exclusive right of public performance for profit of the musical composition referred to, and the instrument itself provides that "the words 'public performance' shall be construed to mean nondramatic renditions with musical instruments." For convenience of reference for the other terms of this instrument, a copy of the same is attached to this opinion and marked "Exhibit A."[1]

---

[1] See end of case.

The plaintiff is a member of the American Society of Composers, Authors, and Publishers, and on February 18, 1922, entered into an agreement with the various members of the said society whereby said society was appointed the agent of the various members. This agreement is as follows:

"To All Whom These Presents may Concern—Greeting:

"The undersigned music publishers are members of the American Society of Composers, Authors, and Publishers.

"The said Society is our duly appointed agent for the licensing of all institutions wherein copyrighted music is publicly performed for profit, as to the musical compositions of which we are copyright proprietors.

"Please, therefore, take notice that no agent, employee, or representative of any of the undersigned is vested with authority or power to grant, under any circumstances, to any firm or individual, any right to publicly perform for profit, the musical compositions of which we are or may be the copyright proprietors.

"Please take further notice that the possession of a printed copy or orchestration of any of such compositions does not imply or convey any right to public performance thereof for profit, irrespective of whether such printed copy is received as a gift, obtained by purchase, or otherwise."

The defendant conducts a moving picture theater at the Princess Theater in the city of Charleston. Admission fees are charged, but no specific charge is made for the music. The defendant employed an organist to render music during the moving picture performances. Her instructions were to play music that would be appropriate to the scenes as they were thrown upon the screen, and she endeavored to interpret the pictures with the music. She was furnished from time to time the "scores" of musical compositions, but the music to be played was left largely in the first instance to her discretion, and she did not confine the music played to the "scores" furnished her. There is no satisfactory evidence that the "score" of "Kiss Me Again" was ever furnished her. On the contrary, she had never seen the publication, but had heard the music and played it "by ear." While she had large discretion in what music she would play, nevertheless she was subject to the orders of the manager, and played any pieces he might direct, and discontinued playing any pieces he might order discontinued. According to her testimony, unless appropriate music was played, one would "get fired."

About the 16th of January, 1922, a moving picture entitled "Ladies Must Live" was shown at the defendant's theater. During the course of the performance the organist played the chorus from "Kiss Me Again." The organist testified substantially that, as the picture was thrown upon the screen, the chorus of "Kiss Me Again" flashed through her mind, and she thought it would be appropriate and played it. She gave no reasons for her opinion. A witness for the plaintiff, who heard the chorus played during the performance, testified that it seemed appropriate. Neither did he give any reasons for his opinion. There is no evidence before the court as to the plot and nature of the picture entitled "Ladies Must Live." The evidence is uncertain whether the chorus was played only one time, or twice during the same performance, or twice on the same day during different performances. But certainly there is no satisfactory evidence that it was played on

any other day. The manager testified that, upon being informed that the chorus had been played, he gave orders for it to be discontinued, for the reason that he did not like it, as he considered the theme old and worn-out and that the public were tired of it. The organist testified, also, that she received this order and did not play the chorus again. There is nothing tending to discredit their testimony. The evidence tending to show that the chorus was played during more than one performance is too vague and unsatisfactory, and I therefore find that it was played only during one performance.

The music of the song (including the chorus) consists of 79 bars; the chorus alone of 42 bars. The words (including the chorus) consist of two stanzas of eight lines each, the second stanza forming the chorus; but, as sung, the last line of the chorus is repeated, so that the chorus, when sung, contains nine lines. A witness for the plaintiff testified that the playing of the chorus took about 5 minutes; the organist testified that it took about 45 seconds. The counsel arranged for the music to be played for me, and at this performance the whole piece took 57 seconds, the chorus only 27 seconds.

[1] The first question presented is whether the plaintiff can maintain its suit for infringement, in view of the assignment to "the Performing Rights Society." The plaintiff claims that the song is a dramatic composition and that the copyright proprietor has reserved the dramatic rights, and the assignment is therefore not an assignment of the whole copyright, and consequently must be deemed a mere license, and the right to sue for infringement remains in the plaintiff as proprietor. The plaintiff cites several English cases and one American case in support of the claim that the song in this case is a dramatic composition. It will not be necessary to review them all. The leading English case appears to be Russell v. Smith, 12 Q. B., 217. In that case it was held that a song called "The Ship on Fire," which related the burning of a ship at sea and the escape of those on board, describing their feelings in vehement language, and sometimes expressing them in the supposed words of the suffering parties, was dramatic, even though it was sung by one person only, sitting at a piano, giving effect to the verses by delivery, but not assisted by scenery or appropriate dress. But in that case the Chief Justice said:

"The song in question is stated in the bill to be founded on the loss of the Kent by fire in the Bay of Biscay. It represents a storm at sea, the burning of the ship, and the escape by boat to another ship, and so a safe return to land. It moves terror and pity and sympathy, by presenting danger and despair and joy, and maternal and conjugal affection. A witness of great experience in publishing music deposes that this was considered a dramatic song, and published with the title of a dramatic and descriptive song, and there was no evidence that any one considered it not dramatic. Thus the nature of the production places it rather in the representative than the narrative class of poetry, according to Lord Bacon's division of dramatic from epic (Advancement of Learning, book 11, Poesy), and the evidence states it to be known as dramatic among those who are conversant with such things."

In the present case there is no evidence that the song "Kiss Me Again" was ever considered by any one as a dramatic song, nor are there any dramatic features in it such as distinguish "The Ship on Fire" from ordinary songs.

The American case cited by the plaintiff is Green v. Luby (C. C.) 177 Fed. 287. In that case a preliminary injunction was issued restraining the defendant from publicly singing a copyrighted song entitled "I'm a-Bringing up the Family," which was written as a part of a copyrighted sketch entitled "The Queen of the Vaudeville." The contention was made that the sketch was a musical composition and not a dramatic composition, but the court held that it was a "dramatico-musical composition." But in that case the singer dressed in costumes which represented different characters. There was a little dialogue or "patter" (the professional term). There was also a little action (the singer getting out of a cradle), and there was scenery, and lights were thrown upon the singer. It was upon these features that the court based its conclusion in that case. None of these features is found in the present case.

The other English cases cited by plaintiff hold that certain songs may be dramatic in character, but if they hold, as plaintiff apparently contends, that all songs are dramatic compositions, I cannot follow them. If the song "Kiss Me Again" is a dramatic composition, then such songs as "After the Ball," "Sweet Violets," "White Wings," "Two Little Girls in Blue," "Wait Till the Clouds Roll By," and scores of others that might be mentioned, which in the not remote past have caught the popular fancy, and have been hummed, whistled, and sung, in season and out of season, on the stage and nearly everywhere else, and have soon faded from the popular mind and passed almost into oblivion, would be deemed dramatic compositions, to say nothing of such modern productions as "Yes, We Have No Bananas To-Day," and the like. I do not think any one would class any of these songs as dramatic compositions, but they are as much entitled to that classification as the song "Kiss Me Again."

[2] But, although this song is not a dramatic composition as it stands, it might conceivably be dramatized. The Copyright Act (Act March 4, 1909, c. 320, § 1, 35 Stat. 1075 [Comp. St. § 9517]) gives the copyright owner the right "to dramatize it, if it be a nondramatic work." Kalem v. Harper, 222 U. S. 55, 61, 32 Sup. Ct. 20, 56 L. Ed. 92, Ann. Cas. 1913A, 1285. By the assignment referred to the plaintiff did not part with the right to dramatize this song. The right to dramatize and the right to the dramatic renditions are not granted. The plaintiff has granted the right to nondramatic renditions only to January 1, 1926. Copyright endures for 28 years from the first publication (Copyright Act, § 23 [Comp. St. § 9544]), in this case from April 16, 1915. The right to nondramatic renditions after January 1, 1926, remains in the plaintiff. It is clear that the plaintiff did not by the assignment part with all interest in the copyright. The copyright is only partially assigned, the assignment being limited both as to time and as to particular rights and privileges.

[3] In relation to the right to sue for an infringement, a copyright is an indivisible thing, and cannot be split up and partially assigned either as to time, place, or particular rights or privileges, less than the sum of all the rights comprehended in the copyright. Certainly the statute authorizing assignments of copyright contains no recognition

of such partial assignments.  Of course, such exclusive rights may be granted, limited as to time, place, or extent of privileges which the grantee may enjoy; but the better view is that such limited grants operate merely as licenses, and not as technical assignments, although often spoken of as assignments.  13 C. J. 1094; Goldwyn, etc., v. Howells, etc. (C. C. A.) 282 Fed. 9; Bobbs-Merrill Co. v. Straus, 147 Fed. 15, 24, 77 C. C. A. 607, 15 L. R. A. (N. S.) 766; New Fiction Publishing Co. v. Star Co. (D. C.) 220 Fed. 994; Public Ledger v. New York Times (D. C.) 275 Fed. 562; Public Ledger v. New York Times (C. C. A.) 279 Fed. 747; Empire City Amusement Co. v. Wilton (C. C ) 134 Fed. 132.  As was said by the Circuit Court of Appeals for the Second Circuit in Goldwyn Pictures Corporation v. Howells, supra:

"The license under a copyright is analogous with that under a patent so far as [it] affects the right to sue, and beginning with the much cited case of Waterman v. Mackenzie, 138 U. S. 252, 255, 11 Sup. Ct. 334, 34 L. Ed. 923, the inability of a licensee to sue for an infringement is no longer an arguable question."

It follows from the foregoing that the plaintiff and not "the Performing Rights Society" is the "proprietor" of the copyright, and is the proper party to sue for an infringement.

[4] The next defense interposed by the defendant is that of abandonment.  The defendant claims that the plaintiff, by the publication of the song before depositing copies with the Register of Copyrights and obtaining the certificate of copyright, abandoned its claim.  Copyright Act, § 9 (Comp. St. § 9530), requires, as one of the steps necessary for the securing of the copyright, a publication of the work with notice of the copyright as required by the act.  This is what was done in this case by the plaintiff, and upon such publication, with the notice, it promptly deposited the copies required by law with the Register of Copyrights.  There is no evidence before the court that the plaintiff published the work without the notice required by the act, and certainly the publication, with the notice, as a preliminary step required by the act for the securing of the copyright, could not be deemed in any sense an abandonment of its claim to a copyright.  Therefore this objection cannot be sustained.

[5] The defendant's next defense is that the organist is an independent contractor, over whose actions while playing the defendant had no control.  He who employs a musician to perform in an exhibition for profit, under a contract by which the musician has authority to play whatever compositions are, in accordance with her judgment, appropriate and fitting, must be held responsible for all that is done by the musician.  By giving her that authority the employer acquiesces in and ratifies whatever she does.  If under his contract he has parted with the right to exercise this control over her actions without making inquiry as to what she intends to play, he yet must be deemed to have taken part, and to have given her the general right to perform copyright compositions.  Harms v. Cohen (D. C.) 279 Fed. 276, 278.  In this case, however, the fact is that the defendant did retain and exercise control over the organist in reference to her selections.  The defense of independent contractor is overruled.

[6] The next defense set up by the defendant is that there has been no performance of the musical composition in question "for profit, as no charge is made for the privilege of listening to the playing of music, which is purely incidental and not a part of the motion pictures exhibited by the defendant." Copyright Act, § 1 (Comp. St. § 9517), provides that the proprietor shall have the exclusive right "to perform the copyrighted work publicly for profit if it be a musical composition and for the purpose of public performance for profit."

The defendant argues that, inasmuch as no charge was made specifically for the music, but only the general admission fee at the door, there is no performance for profit. I think the question is settled by the decision of the Supreme Court in the two cases of Herbert v. Shanley Co. and John Church Co. v. Hilliard Hotel Co., 242 U. S. 591, 37 Sup. Ct. 232, 61 L. Ed. 511. The two cases were heard together, and one decision was rendered. In one case the plaintiff was the owner of a lyric comedy in which there is a march entitled "From Maine to Oregon." It took out a separate copyright for the march and published it separately. The defendant hotel company caused this march to be performed in the dining room of the Vanderbilt Hotel for the entertainment of guests at meal times, in the way now common, by an orchestra employed and paid by the company. In the other case, the plaintiffs were the composers and owners of a comic opera entitled "Sweethearts," containing a song of the same title as the leading feature in the performance. There is a copyright for the opera and also one for the song, which is published and sold separately. The Shanley Company caused the song to be sung by professional singers upon a stage in its restaurant on Broadway, accompanied by an orchestra. The Supreme Court held that the fact that no charge was made for the music did not prevent the performance from being one for profit, that the defendant's performances were not eleemosynary, that they were a part of the total for which the public pays, and the fact that the price of the whole is attributed to a particular item which those present are expected to order is not important. The defense that no charge is made for the music must be overruled.

[7] The next defense interposed is that there is no infringement, because merely the chorus of the copyrighted work was played. The language of the learned counsel for the defendant is as follows:

"'Musical compositions,' within the meaning of the Copyright Act, are not 'performed' in defendant's theater for profit, inasmuch as merely short excerpts of musical selections of varying length are played while the motion picture is being exhibited, the character of the selection constantly and rapidly changing with the shifting of the scenes and the action upon the screen."

To constitute infringement it is not necessary that the whole, or even a large portion, of the work shall have been copied, and on the principle of "de minimis non curat lex" it is necessary that a material and substantial part of it shall have been copied; it being insufficient that mere words or lines have been abstracted. Between these extremes no precise and definite rules can be cited. If so much is taken that the value of the original is sensibly diminished, or the labors of the

original author are substantially and to an injurious extent appropriated by another, that is sufficient in point of law to constitute piracy. The question is one of quality rather than quantity, and is to be determined by the character of the work and the relative value of the material taken. It has been said that in deciding questions of this sort the court must look to the nature and objects of the selections made, the quantity and value of the materials used, and the degree in which this may prejudice the sale, diminish the profits, or supersede the objects of the original work. Perris v. Hexamer, 99 U. S. 674, 25 L. Ed. 308; Marks v. Leo Feist (C. C. A.) 290 Fed. 959; Eggers v. Suns Sales Corporation (C. C. A.) 263 Fed. 373; 13 C. J. 1116. The same objection made here was made in Harms v. Cohen (D. C.) 279 Fed. 276, and was overruled.

Counsel for defendant insists, however, that the precise question under the present Copyright Act has not been passed upon by any appellate court, and that in the case of Harms v. Cohen, Judge Thompson did not have before him certain facts and arguments on the history of the present act and the changes made during the course of its enactment by Congress. In view of counsel's earnest and able argument, I have given full consideration to the question as presented by him from this new standpoint. In order that this new view of the question may be clearly understood, I shall state it in counsel's own language, which is as follows:

"The question whether the playing of a few measures of music coincident with the showing of a motion picture is a public 'performance' of a 'musical composition' is therefore thoroughly novel, and by reason of the vast growth of the motion picture theater business of extreme and vital importance.

"In order to arrive at a solution to the question, not only should the statute be carefully scrutinized, but every other source of information must be sought out and examined. Copyright Act March 4, 1909, § 1 (e), being Comp. St. § 9517, reads: 'That any person entitled thereto. * * * shall have the exclusive right * * * to perform the copyrighted work publicly for profit if it be a musical composition.'

"When, in response to the message of the President, Congress in 1905 sought to amend and consolidate the copyright laws, there were introduced two bills, Senate Bill No. 6330 and House Bill No. 19,853, which were referred to the committee on patents, and numerous sessions were held and volumes of testimony taken, during the years 1906 and 1908, before they were finally enacted into law in the form of the Act of March 4, 1909.

"When the bill was first introduced and sent to the conference committee for consideration thereon it contained this clause (section 1 [f]): 'That the copyright secured by this act shall include the sale and exclusive right to publicly perform a copyrighted musical work or any part thereof. * * *'

"During the progress of the hearings the words 'or any part thereof' were dropped, the words 'for profit' were added, and the law emerged in its present form as follows: 'That any person entitled thereto * * * shall have the exclusive right * * * to perform the copyrighted work publicly for profit if it be a musical composition.'

"The committee on patents went into the matter exhaustively, summoned hundreds of witnesses, lawyers, musicians, publishers and the leaders of every business and profession to be affected by the act, and the result of all their wisdom was the present act, without the words 'or any part thereof.' "

I was very much impressed with this presentation of the matter, and at first I thought the decision of the Supreme Court in Carey v. Dono-

hue, 240 U. S. 430, 36 Sup. Ct. 386, 60 L. Ed. 726, L. R. A. 1917A, 295 (a case not cited by counsel, however), was decisive of this question. In that case a bill to amend the Bankruptcy Law (Comp. St. §§ 9585–9656) in reference to preferences, as it was passed by the House, provided that the four-months period should not expire until four months after the recording, if such recording "is required or permitted." The Senate struck out the words "or permitted" and certain words following these words, and the bill was finally passed as thus amended, and the Supreme Court held that, since Congress had deliberately struck out these words, the court could not supply by construction what Congress had clearly shown its intention to omit. However, a careful study of that case in connection with other sections of the Bankruptcy Law has convinced me that it is not decisive here. There were reasons why Congress might very well have thought it desirable that the time of the four-months period under section 3 of the Bankruptcy Act (Comp. St. § 9587), defining acts of bankruptcy, should run from the date of recording, where recording "is required or permitted," but that it would be best for such time, where the question of a preference alone was involved, to run from the time of recording only when such recording was "required," and not when merely "permitted." Whatever considerations may have moved Congress to omit the words "or permitted," and subsequent words in the House bill, from the amending act in that case, I have upon reflection become satisfied that entirely different considerations moved Congress in omitting the words "or any part thereof" from the present Copyright Act.

The present Copyright Act (section 25 [Comp. St. § 9546]) gives a right of action for an "infringement," but neither the present nor the former act undertook to define the word "infringement." Under the former law, it was clearly settled that the taking of any substantial and material part of the copyrighted work constituted an infringement, and, if Congress had permitted the words "or any part thereof" to remain in the section now under consideration, it would not have been unreasonable to suppose that Congress intended to change the existing rule and to allow damages for the taking of *any part* of the copyrighted work, *no matter how trivial or unsubstantial.* Congress may have considered, also, that the words "or any part thereof," as applied to musical compositions, would be unnecessary, in view of section 3 of the act (Comp. St. § 9519), which protects "all the copyrightable component parts of the work copyrighted."

If the construction contended for by the defendant should be adopted, then the fairest portion of a musical composition, the very parts that make it popular and valuable, may be taken with impunity, provided the work is not taken in its entirety. Such a construction should not be made, save where Congress has clearly expressed such intention. I think the reasonable view is that Congress deemed it wiser not to define how much of a work would have to be taken to constitute an infringement, but to leave each case for judicial determination, in the light of principles which had already been firmly established.

In further support of his proposition that the playing of a short excerpt does not constitute an infringement, defendant's counsel cites

Bloom v. Nixon (C. C.) 125 Fed. 977, Green v. Minzensheimer (C. C.) 177 Fed. 286, and Green v. Luby (C. C.) 177 Fed. 287. The first two arose under the former Copyright Act (26 Stat. 1100); the last one, under the present law. None of them decides the present question. The first two merely decide that where a part of a song (in the first case, the chorus merely; in the second case, the chorus and one verse, with musical accompaniment) was used merely as a vehicle for mimicry of a certain actress and her postures, gestures, and mannerisms: the mimicry was the real performance, and the song itself was not being performed. The third case cited held that the singing of the whole song in question was not necessary for the purpose of mimicry, and the performance would be enjoined, although defendant claimed she sang it merely for the purpose of mimicry.

Counsel argues that the use of a part of a song by moving picture shows is merely as a vehicle to "put the pictures across." If such use were permitted, the thousands of moving picture shows throughout the country could use the very best portions of copyrighted songs for their own benefit, until the public were thoroughly tired of hearing them, and the owners would have little left of any value. I cannot think that Congress intended any such result.

The case of Hein v. Harris, 183 Fed. 107, 105 C. C. A. 399, arose under the former Copyright Act, and was cited by defendant's counsel. But, if it decides this question at all, it is contrary to defendant's contention. In that case a restraining order was issued against making use of the music in the chorus of the song known as "The Arab Love Song" in the operetta "The Boys and Betty." The infringement was found in the chorus of the song entitled "I Think I Hear a Woodpecker Knocking at My Family Tree." The court really decided only two points: (1) That the complainant's composition disclosed sufficient novelty to be entitled to a copyright; and (2) that it was no defense that defendant did not intend to copy complainant's composition, but without knowledge of it independently produced the same thing. The point that the appropriation of the chorus only would not constitute an infringement was apparently not discussed or raised, though the court stated that the chorus published by defendant was an infringement.

Applying the principles above stated to the case now before the court, I think that there was the use of such a substantial and material part of the plaintiff's song as to constitute an infringement. It is true that the chorus constitutes only a part of the song, but it constitutes half of it, and the whole chorus was played. It was easily distinguished by the witness for the plaintiff, who was present at the performance. In order to assist the court on this point, counsel for the parties arranged for the music to be played before me. I do not profess any special knowledge or judgment on such matters, but the impression made on hearing the music was that the chorus would probably be as pleasing to the public as any other part of the song, possibly more so. In view of all the circumstances, I think the chorus is a substantial and material part of the song, and the playing of it for profit constitutes an infringement.

[8, 9] The next defense is that the agreement between plaintiff and other copyright proprietors, dated February 18, 1922, constitutes a monopoly, in violation of the Sherman Act. It is not necessary to decide whether the agreement constitutes a monopoly, nor whether the rights affected can be considered trade or commerce, nor whether interstate commerce is directly affected or not. The Sherman Act does not make the party to an interstate monopoly an outlaw. It does not prevent such a party from asserting his rights in the courts. It does not give any person the right to trespass upon the rights of such party, or to deprive him unlawfully of his property. There is no provision in the act divesting the members of combinations in restraint of trade of their property. The illegality of such a combination cannot be tested collaterally. The act itself provides the remedies against the illegal combination and these remedies are exclusive. Geddes v. Anaconda Mining Co., 254 U. S. 590, 593, 41 Sup. Ct. 209, 65 L. Ed. 425; Wilder Mfg. Co. v. Corn Products Co., 236 U. S. 165, 174, 35 Sup. Ct. 398, 59 L. Ed. 520, Ann. Cas. 1916A, 118; Paine Lumber Co. v. Neal, 244 U. S. 459, 471, 37 Sup. Ct. 718, 61 L. Ed. 1256; U. S. v. Babcock, 250 U. S. 328, 331, 39 Sup. Ct. 464, 63 L. Ed. 1011.

It is true that the fact of such a monopoly was held to be a defense in Continental Wallpaper Co. v. Voight, 212 U. S. 227, 29 Sup. Ct. 280, 53 L. Ed. 486, but that case was a suit on a contract which grew directly out of the illegal agreement. There was no independent collateral agreement. The elements of illegality inhered in the very contract sued on. In Wilder Mfg. Co. v. Corn Products Co., supra, the Supreme Court pointed out these distinctions. In any event the later cases I have cited are controlling. For these reasons the defense interposed under the Sherman Act (Comp. St. § 8820 et seq.) must be overruled.

[10] The next question relates to the amount of damages. There is no proof of actual damages or profits. The plaintiff contends that the case is governed by the general clause of subdivision (b) of section 25 of the Copyright Act, and that the damages must be assessed at not less than $250 and not more than $5,000. Defendant contends that the court is restricted to an allowance of $10 for each infringing performance of a musical composition, as provided in the "fourth" paragraph of section 25. The "fourth" paragraph also provides in the case of a dramatic or dramatico-musical composition for an allowance of $100 for the first and $50 for each subsequent infringing performance. But inasmuch as the court has held that this song is not a dramatic or dramatico-musical composition, and in view also of the conclusion that the court has reached as to the proper construction of section 25, this part of the "fourth" paragraph need not be considered. So the question is: Must the court allow at least $250 under the general clause, or must it allow only $10 for each performance under the "fourth" paragraph?

Section 25 of the Copyright Act (Comp. St. § 9546) provides that the person infringing shall be liable:

"(a) * * *

"(b) To pay to the copyright proprietor such damages as the copyright proprietor may have suffered due to the infringement, as well as all the

profits, * * * or in lieu of actual damages and profits such damages as to the court shall appear to be just, and in assessing such damages the court may, in its discretion, allow the amounts as hereinafter stated, but in the case of a newspaper reproduction * * * and such damages shall in no other case exceed the sum of five thousand dollars nor be less than the sum of two hundred and fifty dollars, and shall not be regarded as a penalty: * * *

"First. In the case of a painting, statue, or sculpture, ten dollars for every infringing copy made or sold by or found in the possession of the infringer or his agents or employees;

"Second. In the case of any work enumerated in section five of this Act, except a painting, statue, or sculpture, one dollar for every infringing copy made or sold by or found in the possession of the infringer or his agents or employees;

"Third. In the case of a lecture, sermon, or address, fifty dollars for every infringing delivery;

"Fourth. In the case of a dramatic or dramatico-musical or a choral or orchestral composition, one hundred dollars for the first and fifty dollars for every subsequent infringing performance; in the case of other musical compositions, ten dollars for every infringing performance."

From a casual reading of this section, it would seem that the case of a musical composition being apparently specifically provided for in the "fourth" paragraph, the case would be governed by that paragraph, which provides $10 for each performance, and that resort could not be had to the general clause in subdivision (b), providing $250 as the minimum, and at first I was very firmly of opinion that this was the proper construction. But a careful study of the act in the light of the decision of the Supreme Court in Westermann Co. v. Dispatch Co., 249 U. S. 100, 39 Sup. Ct. 194, 63 L. Ed. 499, convinced me that such is not the proper construction. In that case the infringement was of a "pictorial illustration," which is one of the copyrightable works enumerated in section 5 of the Copyright Act (Comp. St. § 9521). It would appear therefore that the case was provided for by the "second" paragraph of section 25. The Supreme Court held, however, that the case was governed by the general clause and the minimum of $250 fixed as the "just" damages to be allowed by the court. The Supreme Court said in that case:

"The fact that these damages are to be 'in lieu of actual damages' shows that something other than actual damages is intended—that another measure is to be applied in making the assessment. There is no uncertainty as to what that measure is or as to its limitations. The statute says, first, that the damages are to be such as to the court shall appear to be just; next, that the court may, in its discretion, allow the amounts named in the appended schedule; and, finally, that in no case shall they be more than $5,000 nor less than $250, except that for a newspaper reproduction of a copyrighted photograph they shall not be more than $200 nor less than $50. In other words, the court's conception of what is just in the particular case, considering the nature of the copyright, the circumstances of the infringement and the like, is made the measure of the damages to be paid, but with the express qualification that in every case the assessment must be within the prescribed limitations, that is to say, neither more than the maximum nor less than the minimum. Within these limitations the court's discretion and sense of justice are controlling, but it has no discretion when proceeding under this provision to go outside of them."

Now, what did the court refer to when it said "the court *may, in its discretion,* allow the amounts named in the *appended schedule*"?

(Italics mine.) It is clear that by the "appended schedule" the court meant the "first," "second," "third," and "fourth" paragraphs of section 25. When the statute is carefully studied in the light of this decision and the decision of the Circuit Court of Appeals in the same case (233 Fed. 609, 147 C. C. A. 417), the conclusion is irresistible that the proper construction of the section is that paragraphs "first," "second," "third," and "fourth" may be resorted to by the court in cases to which these paragraphs respectively apply in assessing such damages as may appear just, but the court must in all cases assess such damages at not less than $250 nor more than $5,000, except where other specific provision is made in subdivision (b) itself.

This view finds support in the decision of the Circuit Court of Appeals for this circuit in Campbell v. Wireback, 269 Fed. 372, 17 A. L. R. 743. That was a case of infringement of advertising cuts, and the District Court allowed $1 for each infringing copy found in defendant's possession; the total amount allowed being $4,000. The allowance was clearly based on the provisions of paragraph "second" of section 25. Objection was raised in the appellate court that the District Court had not exercised its discretion, but had merely based the assessment on the number of copies, and therefore it was not an award of "such damages as to the court shall appear to be just." The appellate court held, however, that the presumption was that the District Court had exercised its discretion. It is obvious that, if paragraph "second" should be deemed absolutely controlling, there would have been no occasion for the court to hold that the District Court was presumed to have exercised its discretion under the provisions of subdivision (b). While this decision was under paragraph "second," there can be no difference whatever on this point between the proper construction of paragraph "fourth" referring to musical compositions and paragraph "second" referring to certain other works.

The District Court for the Southern District of California, in the case of Waterson v. Tollefson (D. C.) 253 Fed. 859, came to the same conclusion on this point, although that court did not have the benefit of the decision of the Supreme Court in the Westermann Case, supra, as the Supreme Court decision had not been rendered at that time. I think therefore, that I am bound to fix damages at not less than $250, but in the circumstances of this case, I think that amount ample. Therefore, in the exercise of my discretion, the sum of $250 is assessed as just damages in lieu of actual damages and profits.

[11, 12] The final question is upon the allowance of costs and attorney's fees. Under section 40 of the Copyright Act (Comp. St. § 9561), the allowance of an attorney's fee rests in the discretion of the court. The circumstances of this case, the fact that there was only one sporadic infringement, that orders were promptly given to discontinue the playing of the composition in question, and that no actual damage has been shown, would indicate that no attorney's fee should be allowed. On the other hand, there has been an invasion of plaintiff's right, which it has been compelled to assert by action, and in the prosecution of that right, it has been met with an able and vigorous defense at every point. An allowance of a full fee commensurate with the services of plaintiff's

attorneys which were necessary to combat the defenses interposed would bear too heavily upon the defendant, in view of the character of the infringement and the circumstances surrounding it; but, if no fee should be allowed at all in such cases, it would probably result in many cases in a practical denial of the rights of copyright owners. Balancing these considerations, I think an attorney's fee should be allowed, but it should be a very moderate one. I therefore allow an attorney's fee for plaintiff's attorneys and fix the same at $100.

[13, 14] As to the costs, section 40 of the Copyright Act is mandatory. "Full costs" must be allowed. The plaintiff is therefore entitled to costs, including a reasonable fee to the special master for his services.

Let a final decree be prepared and entered, providing for permanent injunction, and recovery by plaintiff of the sum of $250 damages, attorney's fees, and costs, in accordance with the foregoing conclusions.

### Exhibit A.

### Assignment of Performing Rights.

Whereas, existing conditions of the American Society of Composers, Authors and Publishers (hereinafter called the Performing Rights Society) are such that it is for its best interests that the performing rights (as hereinafter defined) of the works of its members should vest in such society for a limited time; and

Whereas, under these conditions, it is deemed for the advancement and protection of the mutual interests of the members and to their benefit that each member shall execute an assignment of such rights to the Performing Rights Society; and

Whereas, each member has severally agreed with the other members and with the Performing Rights Society to execute such assignment:

Now, therefore, the undersigned, for good and valuable considerations, sells, assigns, transfers, and sets over unto the Performing Rights Society, its successor and successors, for a period commencing from the date hereof and continuing until January 1, 1926, the exclusive right of public performance for profit, in the United States and Canada, United Kingdom of Great Britain and Ireland, and Italy, the music of each and every musical work which at the time of the date hereof belongs to the undersigned, or which hereafter and during the period ending January 1, 1926, shall be written, composed, or acquired by the undersigned.

The words "public performance" shall be construed to mean nondramatic renditions with musical instruments.

The undersigned agrees that the exclusive right of public performance for profit of musical works now existing is hereby vested in and shall belong absolutely to the Performing Rights Society, for a period commencing on the date hereof and ending January 1, 1926, and such exclusive right in any and all musical works that hereafter may be written, composed, or acquired by the undersigned from and after the date hereof and until January 1, 1926, shall immediately upon the same being written, composed, or acquired by the undersigned, vest in and be the absolute property of the Performing Rights Society, until the 1st day of January, 1926.

Provided, however, that in the case of musical plays, such exclusive right shall be limited to the performance for profit of the separate numbers, fragments, or arrangements, melodies or selections forming part or parts thereof, and shall not include the right of performance of plays in their entirety or of any part thereof as stage plays, or as part of stage plays, which last-mentioned right is hereby expressly excepted from this assignment and reserved to the undersigned.

All the profit, benefit, and advantage that shall or may arise from such exclusive performing rights hereby sold, assigned, transferred, and set over

to the Performing Rights Society for such period, shall be held and enjoyed' by the Performing Rights Society, subject to the articles of association of such Performing Rights Society.

The undersigned hereby irrevocably, until January 1, 1926, authorizes, empowers, and vests the right in the Performing Rights Society, in the name of the undersigned, or its name or otherwise, and under the copyrights of the. undersigned in any and all such works, to institute and prosecute actions to restrain and recover damages for the infringement or violation of the rights vested in it by this assignment, and to release, compromise, or to refer to arbitration, in its discretion, any and all such actions in the same manner and to the same extent and to all intents and purposes, as the undersigned might or could do, had this assignment not been made.

And the undersigned hereby makes, constitutes, and appoints the said Performing Rights Society its successor and successors, the true and lawful attorney of the undersigned irrevocably during the said period, commencing from the date hereof, and terminating January 1, 1926, in the name of the undersigned, or in its name, in its discretion, but for the sole and proper use and benefit of the said Performing Rights Society and its successor and successors, to do all acts, take all proceedings, and execute, acknowledge, and deliver any and all instruments and documents that may be necessary, proper, or expedient, to restrain and recover damages under the copyrights of such works or otherwise, for the infringement or other violation of the rights hereby granted in such works, and to release, compromise, or refer to arbitration any such proceedings or actions or to make any other disposition of differences in relation to the premises.

The undersigned further agrees from time to time, during the period commencing on the date hereof and ending January 1, 1926, to execute, acknowledge, and deliver to the Performing Rights Society such assurances, powers of attorney, or other authorities or instruments as may be deemed necessary or expedient by the Performing Rights Society to enable it to exercise and enforce, in its own name or otherwise, all such rights and remedies as aforesaid.