THOMAS D. ARMOUR AND ESTELLE C. ARMOUR, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 39890.    Filed April 30, 1954.

*Robert A. Littleton, Esq.*, for the petitioners.
*Newman A. Townsend, Jr., Esq.*, and *Leigh A. Crockett, Esq.*, for the respondent.

OPINION.

FISHER, *Judge:* Thomas D. Armour, who will hereinafter be referred to as petitioner, is a prominent professional golfer who is better known as Tommy Armour. In 1946, he entered into an agreement with the Worthington Ball Company which gave that company "the exclusive right, license, and privilege to use his name, either in facsimile signature or script, as a trade-mark on golf balls manufactured by or for, or sold by" the company together with permission to use photographs of the petitioner in connection with the advertising and sale of such balls. The company agreed to pay petitioner 10 cents per dozen for the first 10,000 dozens of such balls sold in a calendar year and 5 cents per dozen sold thereafter, with a minimum guaranteed "royalty" of $1,000 per year. Petitioner was also to receive from the company "six dozen high grade golf balls per month, no charge, for the duration of this contract." The contract was for a period of 5 years with the option to the company of renewing the agreement on the same terms and conditions for an additional 5 years. This contract continued a similar relationship which had existed between these parties since 1933.

In 1943, petitioner entered into an agreement with the Crawford, MacGregor, Canby Company (hereinafter referred to by the name of its most recent successor, Sports Products, Inc.) for a period of 5 years with automatic renewal for two additional 5-year periods unless the company gave notice of its intention not to renew 30 days prior to the expiration of any period. The second 5-year term of the contract began in 1948. Petitioner agreed by this contract:

(1) That he "does hereby give and grant to Company * * * the exclusive right and license during the terms of this agreement, to manufacture, sell and/or advertise, and to license others to manufacture, sell and/or advertise golf clubs, bags and equipment identified by the name, facsimilar [*sic*] signature, initials, portrait or any nickname of Professional, or any combination thereof.";

(2) That he would "sign all proper and lawful documents necessary or desirable for obtaining federal or State trade-mark registrations for the right herein granted Company to use a mark identified with Professional.";

(3) That he would use in play and instruction exclusively the golf clubs made and/or sold by the company and that the company could so advertise;

(4) That he would "put forth his best efforts to promote good will for the Company and its products," and "do his utmost to influence the use of, purchase and sale of all types of golf equipment manufactured and/or sold by Company."; and

(5) That he would spend up to 10 days a year at the company's factory "to assist in designing and creating new golf clubs and other equipment."

The company agreed to pay petitioner "a royalty on the net sales of Armour monogrammed wood and iron golf clubs, bags and equipment of three per cent (3%) on the Company's net sales," to continue its distribution of such items "whenever permissible or expedient to do so," and to furnish petitioner with two sets of "Tommy Armour trade-mark clubs" per year for his personal use. This contract continued a similar relationship which had existed between these parties since 1934.

On May 31, 1949, the Worthington Ball Company wrote to petitioner's wife to the effect that because of a new trade-mark law it was necessary for the company to have petitioner's written consent to use his name on golf balls despite their contract. The letter enclosed two copies of "agreements" for petitioner to sign and return at the request of the company's patent attorney. On June 13, 1949, petitioner complied with the request. The terms of the "agreements" are set forth in our Findings of Fact.

On July 19, 1949, petitioner executed and delivered to Sports Products, Inc., a statement substantially the same in all material respects as the "agreements" delivered to Worthington Ball Company.

Prior to the passage of the Lanham Act on July 5, 1946 (15 U. S. C. sec. 1051, etc.; 60 Stat. 427), an individual's name could be registered only if presented in some particular or distinctive manner or in association with the portrait of the individual (sec. 5 (b), Trade-Mark Act of Feb. 20, 1905, 33 Stat. 725). The provisions of the Trade-Mark Act of Feb. 20, 1905, were declaratory of the then existing law to the effect that exclusiveness could not be acquired in a personal name because of the restriction imposed upon others bearing the same name (Amdur, Trade-Mark Law and Practice, Lanham Act ed., 1948, pp. 201–203, and cases cited therein). Section 2 of the Lanham Act (15 U. S. C. sec. 1052, 60 Stat. 428), however, provides in effect that no trade-mark shall be refused registration on the principal register on account of its nature, even if it consists of or comprises a name identifying a particular living individual, provided such individual gives his written consent.

The provision of the 1946 act had the effect, therefore, of permitting the registration of the name "Tommy Armour" as a trade-mark, with his written consent, upon compliance with the other requirements of the law.

On May 29, 1951, Worthington Ball Company registered the name "Tommy Armour" with the United States Patent Office as a trade-mark for use on golf balls. There is nothing in the record to indi-

cate that Sports Products, Inc., applied for registration of its trade-mark on the basis of the similar statements which petitioner executed on July 19, 1949.

We mention preliminarily that the contract with Sports Products, Inc., required a limited amount of personal services from petitioner upon request. It is obvious that any amount attributed to such personal services would be ordinary income but, since we have determined that all the amounts received by petitioner involved in this case are to be deemed ordinary income, it is unnecessary to make an apportionment.

We will first consider the treatment of the earnings under both contracts prior to the respective dates of execution of the consents to registration. The sum of $15,289.43 represents an amount received by petitioner under the contract with Sports Products, Inc., attributable to sales made by the company prior to July 19, 1949, the date on which petitioner consented to the registration of his name as a trade-mark by Sports Products, Inc. The above amount (together with an additional amount received by virtue of the same contract for the year 1949, attributable to sales made after July 19, 1949) was paid to petitioner after July 19, 1949. A similar situation applies to the Worthington contract, the amount of $833.71 being attributable to sales made prior to June 13, 1949 (the date of the consent to registration by Worthington), but paid subsequent to that date with other 1949 earnings.

Respondent contends that under no circumstances could these amounts be deemed to have been received by petitioner as the result of a sale, on the theory that the contracts, at least up to the dates of the consents to registration, represented licensing agreements and did not amount to sales. Petitioner's brief does not devote itself to this problem and it might be assumed that petitioner concedes respondent's contention in this respect if it were not for the fact that petitioner's counsel took the contrary position in his opening statement. Error in this respect is also asserted in the petition filed with this Court. We, therefore, deem it necessary to express our opinion on this issue.

The Worthington contract provides for the use of the name "Tommy Armour" on golf balls for a period of 5 years, and gives Worthington the right to renew the agreement for an additional 5-year period with the same royalties. It also gives Worthington the right to terminate the contract at the end of any full year by appropriate notice.

The contract with Sports Products, Inc., contains like provisions except that the agreement provides for two 5-year renewals in the absence of termination by Sports Products, Inc.

Since it is clear that the duration of each contract is limited, the contracts cannot be deemed to have constituted sales, because each of

the sports companies acquired limited rights, less than the whole interest which might have been transferred to each. *Sabatini* v. *Commissioner*, 98 F. 2d 753, 755; *Witmark & Sons* v. *Pastime Amusement Co.*, 298 F. 470, affirmed per curiam 2 F. 2d 1020. See also analysis of the distinction between sale and license by Judge Harron in *Seattle Brewing & Malting Co.*, 6 T. C. 856, 866.

The applicable underlying principles are stated in *Goldsmith* v. *Commissioner*, 143 F. 2d 466, where Judge Chase said, in part, (p. 467):

When by those terms the assignee acquires less than the sum of all the rights which together make up the copyright which as a whole is property and may be conveyed as such, it does not matter whether he is called an assignee in the instrument or whether that is called an assignment or something else. If he gets only the rights of a licensee, the so-called assignment amounts only to a license. M. Witmark & Sons v. Pastime Amusement Co., D. C., 298 F. 470, affirmed 4 Cir., 2 F. 2d 1020. And when that is so the amount which the assignee pays for what he gets is for tax purposes to be treated as ordinary income to the recipient because it is in fact royalty income. * * *

On the basis of the foregoing, we hold that the payments received by petitioner under both the Worthington and Sports Products, Inc., contracts, attributable to the periods prior to the respective dates of his consents to registration of the trade-mark, constituted ordinary income derived from licensing agreements and cannot be accorded capital gain treatment.

We turn to the amounts received by the petitioner attributable to the contracts for periods subsequent to the dates of the execution of the respective consents to trade-mark registration. Under the Sports Products, Inc., contract, the amounts so attributable were $5,096.48 for 1949 and the entire amount paid for 1950. Under the Worthington contract, the 1949 amount attributable to the period after the execution of the consent was $583.81. The same issue applies to all of the amounts attributable to the Worthington contract for 1950.

The emphasis of petitioner's contention is to the effect that the filing of the consents to registration, each of which includes the words "from this date forth," altered the original arrangement under each contract to the end that Sports Products, Inc., and Worthington thereby received "perpetual" rights to the use of the name "Tommy Armour" upon the items covered by the respective contracts. It is petitioner's contention that even if the contracts were mere licenses prior to the execution of the consents, such execution changed the contracts into sales of the right to use the name, and that the proceeds of such sales must receive capital gain treatment. It is our view that the execution of the consents had no such effect upon the contracts for the reasons set forth below.

It should be noted that the Worthington contract in its original form provided that Worthington, for the period of the contract, should have the exclusive right, license, and privilege to use the name "Tommy Armour" as a trade-mark on golf balls. There is no provision in the contract requiring petitioner to execute any further papers which might be necessary for the purpose of registering the name. In transmitting the forms of consent to petitioner through his wife, the transmittal letter stated, among other things, "If you will have Tommy sign these two agreements and return same to us, this will be greatly appreciated." There was no suggestion of any legal obligation on the part of petitioner to sign the consent. The consent has no provision for a consideration, and uses the word "give" in relation to yielding the right to registration.

The Sports Products, Inc., contract contains the following provision:

At the request of the Company, Professional agrees to sign all proper and lawful documents necessary or desirable for obtaining Federal or State trade-mark registrations *for the right herein granted* Company to use a mark identified with Professional. * * * [Italics supplied.]

There is no transmittal letter in the record concerning the consent in relation to Sports Products, Inc., but the consent likewise uses the word "give" and recites no consideration.

We will assume for the purpose of discussion, however, that on the basis of the considerations provided for in the contracts, both Worthington and Sports Products, Inc., could have required Armour to execute his consent to trade-mark registration, although there is no provision to such effect in the Worthington contract.

If we take the view (which we do not) that the effect of the words "from this date forth" in the consents had the effect of transferring petitioner's entire interest in the use of his name in perpetuity (or for the life of the trade-marks), the effect of such construction would be to amend and extend the period of duration of the contracts without consideration. No doubt petitioner could have brought about this effect if he desired to do so, but the transfer would merely result in a voluntary amendment of the agreements, and would not have amounted to a sale, upon valuable consideration, of petitioner's remaining interest in the use of the name for the items referred to in the contracts.

We think it clear, however, that the words "from this date forth" are not to be construed to the effect that petitioner's interest in the use of his name was transferred "forever thereafter" (or for the entire life of the trade-marks). The words in question must be read in relation to, and in the context of, the time limitations set forth in the basic agreements. There is nothing to indicate that the consents were

intended to extend in any way the duration of the agreements, or to effect so radical a change as to convert the basic contracts from agreements of limited duration to contracts granting a perpetual right. We construe the words in question to mean merely that the consents shall apply from the dates of their respective execution to the time of termination of the contracts to which they respectively related.

In addition to what we deem to be the obvious meaning of the words "from this date forth" in the context in which they were used, we again refer to the circumstances surrounding the execution of the consents. The language of the contract with Sports Products, Inc., requires petitioner to sign all proper documents for obtaining trademark registrations "for the right herein granted company." No intention to alter that "right" is expressed in the consent executed for the benefit of that company. Although the Worthington contract has no provision for execution of supplemental documents, the letter requesting the consent makes specific mention of the contract without expressing any intention to alter its terms and conditions by the execution of the consent. We think that an intention to make a material alteration in the contract may not be inferred with respect to either of the consents without very clear language to that effect. We have already expressed the view that no consideration passed for an extension of the duration of the contracts, but we add, in addition to our determination of the question of law applicable thereto, that from the standpoint of intention the lack of any new or additional consideration would weigh strongly against the construction urged by petitioner.

Since the execution of the consents did not extend the duration of the contracts, it is our view that the authorities already cited and the underlying principles which we have applied in our treatment of the amounts attributable to the periods *prior* to the consents, are equally applicable to the periods *subsequent* thereto. We hold, therefore, that the amounts received by petitioner under the contracts in question, for the periods both prior and subsequent to the consents, constituted ordinary income from licensing agreements and are not to be given capital gain treatment.

*Decision will be entered under Rule 50.*