JOSEPH A. FIELDS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 9974, 13469.   Promulgated June 20, 1950.

*I. Herman Sher, Esq.*, for the petitioner.
*Walt Mandry, Esq.*, for the respondent.

1208

OPINION.

HARRON, *Judge*: *Issue 1.*—The main issue in this proceeding is whether the sums received by the petitioner during 1942 and 1943 for the exclusive motion picture rights to his plays, "My Sister Eileen" and "The Doughgirls," are taxable as long term capital gains under section 117 (j) of the Internal Revenue Code,[1] as contended by the

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

\* \* \* \* \* \* \*

(j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, \* \* \*

(2) GENERAL RULE.—If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. \* \* \*

petitioner, or whether they are taxable as ordinary income, as contended by the respondent.

The petitioner argues that the payments by the motion picture companies were made in exchange for his sale of a property interest in the copyrights of "My Sister Eileen" and "The Doughgirls" within the meaning of section 117 (j) of the Internal Revenue Code, and, therefore, are taxable as long term capital gains. In order for the payments to come within section 117 (j), the petitioner must show, in this case, that they were gains from (1) the sale, (2) of property used in his trade or business which is subject to the allowance for depreciation, (3) and held for more than six months. The respondent takes the view that the petitioner received these payments as royalties for the grant of a license for the use of his properties, and that the receipts from such a transfer are taxable as ordinary income. In the alternative, the respondent argues that even if the transfer of the motion picture rights to the plays constituted a sale of property, the proceeds from their transfer can not be treated as long term capital gains under section 117 (j) because the properties were not used in the petitioner's trade or business.

This Court, in *Clifford H. Goldsmith*, 1 T. C. 711; affirmed on another ground, 143 Fed. (2d) 466; certiorari denied, 323 U. S. 774, considered issues, under similar facts, substantially the same as the issues in this proceeding. However, the applicability of section 117 (j), which was added to the Internal Revenue Code by section 151 (b) of the Revenue Act of 1942, was not considered in the *Goldsmith* case, which involved deficiencies for the years 1938 and 1939. The applicability of section 117 (j) to the facts of this proceeding presents a new question. We have undertaken to review certain principles of law and other authorities, as set forth immediately hereafter, which we believe pertinent to the question. Applying these principles and authorities to the facts in this proceeding, we believe that the analysis of the similar facts and the *rationale* of the Court of Appeals for the Second Circuit in the *Goldsmith* case, *supra*, as set forth in its opinion, should be followed in this proceeding; and we come to the conclusion that the payments in question were received by the petitioner in exchange for his sale of a property interest in the copyrights, but that the proceeds from their transfer can not be treated as long term capital gains under section 117 (j) because the properties were not used in the petitioner's trade or business.

The Copyright Act, 61 Stat. 652, 17 U. S. C., section 1, makes no specific provision for an assignment of only part of the rights secured under the registration of a copyright; the efficacy of partial assignments is left to the more uncertain rules of case law. If the copyright is viewed as an indivisible unit, any agreement disposing of less than the totality of the rights derived under the registration of the copyright

merely confers the privilege of using the copyright in a particular manner and is, therefore, in the nature of a license agreement. This has been the preponderant view adopted by the courts, although it has been stated primarily in those cases which were concerned with whether the owner of a copyright is a necessary party to any suit for its infringement.[2] These cases dealt with procedural matters and were based upon a similar theory in patent law. See *Waterman* v. *Mackenzie*, 138 U. S. 252; *Gayler* v. *Wilder*, 10 How. 476. The *rationale* of the decisions was that the rule was necessary to protect the infringer against harassment by successive law suits. *Widenski* v. *Shapiro, Bernstein & Co.*, 147 Fed. (2d) 909; *Marks Music Corporation* v. *Vogel Music Co.*, 140 Fed. (2d) 266; *Witmark & Sons* v. *Pastime Amusement Co.*, 298 Fed. 470; affd., 2 Fed. (2d) 1020; cf. *Waterman* v. *Mackenzie, supra; Gayler* v. *Wilder, supra.*

But in *Roberts* v. *Myers*, 20 Fed. Cas. 898, No. 11,906, it was expressly stated that a copyright was divisible in an opinion which upheld the right of an exclusive licensee to an injunction against the infringement of his rights to a play. And in *Ford* v. *Blaney Amusement Co.*, 148 Fed. 642; *Fitch* v. *Young*, 230 Fed. 743; affd., 239 Fed. 1021; and *Public Ledger Co.* v. *New York Times*, 275 Fed. 562; affd., 279 Fed. 747; certiori denied, 258 U. S. 627, it was said that a copyright was divisible to the extent that the Copyright Act recognized separate rights comprising the copyright. See also *Manners* v. *Morosco*, 258 Fed. 557; reversed on another ground, 252 U. S. 317; *Photo Drama Motion Picture Co.* v. *Social Uplift Film Corporation*, 213 Fed. 374; affd., 220 Fed. 448; *Black* v. *Allen Co.*, 42 Fed. 618.

The procedural justification for the majority rule no longer has basis in fact, since an exclusive licensee now has the right to sue for infringement, subject to the formality of joining the owner as a party plaintiff or as a party defendant. In *Independent Wireless Telegraph Co.* v. *Radio Corporation of America*, 269 U. S. 459, it was held that an exclusive licensee of certain rights under a patent may join the patent owner as a codefendant if he is within the jurisdiction of the court, or as involuntary plaintiff if he is without the jurisdiction and declines to join in the suit. This holding has been applied to the field of copyright law. See *Page & Co.* v. *Fox Film Corporation*, 83 Fed. (2d) 196; *Stephens* v. *Howells Sales Co.*, 16 Fed. (2d) 805; cf. Federal Rules of Civil Procedure, rule 19 (a).

"Taxation is not so much concerned with the actual refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." *Corliss* v. *Bowers*, 281 U. S. 376,

---

[2] The leading cases in which this view has been adopted are *Witmark & Sons* v. *Pastime Amusement Co.*, 298 Fed. 470; affd., 2 Fed. (2d) 1020: *Goldwyn Pictures Corporation* v. *Howells Sales Co.*, 282 Fed. 9; certiorari denied., 262 U. S. 755; *New Fiction Publishing Co.* v. *Star Co.*, 220 Fed. 994; *Empire City Amusement Co.* v. *Wilton*, 134 Fed. 132, 133.

378.   See also *Helvering* v. *Clifford*, 309 U. S. 331; *Griffiths* v. *Helvering*, 308 U. S. 355, 357; *Klein* v. *United States*, 283 U. S. 231, 234.   In *Parke, Davis & Co.*, 31 B. T. A. 427, the contract recited that, in consideration of certain payments to be made, the licensor sells and grants to the licensee the exclusive right, license, and privilege to make and use, but not to sell, the invention covered by the patents.   Each party agreed not to sell the invention or license its use without the consent of the other.   The question before the Board was whether the transaction was a license or a sale.   In holding that it constituted a sale for income tax purposes, the Board said:

> We are familiar with the decisions cited by respondent holding that purported assignments of patent rights which failed to grant the right to the assignee to sell the patent or license its use were in themselves only licenses  *  *  *  [Citing cases.]   The question presented in these cases was the right of the so-called assignee to maintain a suit for infringement which right was denied because the right to sell the patents or license their use had been retained by the assignor.

> In none of the cited cases did the court have the situation here existing. The questions there presented were entirely different from the one before us for decision.   The right to maintain a suit at law is often controlled by the question of the possession of the naked legal title.   Here we have a question of income tax liability where legal title is of little consequence and the inquiry is as to the ownership of the beneficial interest.   We are not to determine whether petitioner or Eli Lilly & Co. could maintain a suit for infringement in its own name, but merely whether petitioner, under its contract with Eli Lilly & Co., divested itself irrevocably of certain capital investments in consideration of the payment made to it by the latter company.

> *  *  *  Legal title alone, without beneficial ownership, and held for the interest of another, is without value.  *  *  *

See also *Goldsmith* v. *Commissioner*, *supra;* *Seattle Brewing & Malting Co.*, 6 T. C. 856, 869; affd., 165 Fed. (2d) 216.

There is nothing inherent in the nature of a copyright which precludes the separate sale of the several parts which make up the whole.[3] The Copyright Act segregates the various exclusive rights derived under the registration of a copyright into separately numbered paragraphs.   The major rights arising under the copyright of a play are (1) the exclusive right to publish the play; (2) the exclusive right to present the play on the speaking stage; (3) the exclusive right to present the play on the radio; and (4) the exclusive right to make and exhibit motion pictures of the play.   Each of these exclusive rights is enforceable by the owner against all persons.   Each is substantial in itself and may be exploited independently of any of the others.   Each may form the basis of a new copyright secured in the name of the holder of the exclusive right.

---

[3] E. g., section 5 of the English Copyright Act of 1911 expressly allows partial assignments and specifically recognizes the partial assignee as the *owner* of the rights assigned, with all the accruing rights and privileges of ownership.   See also the Canadian Copyright Act of 1927, sec. 12.

Only one case has considered whether or not the transfer of the exclusive motion picture rights in a play is a "sale" within the meaning of section 117 of the Internal Revenue Code. In *Goldsmith* v. *Commissioner*, *supra*, which involved facts similar to those in this proceeding, the majority of the Second Circuit Court of Appeals held that the transfer of the exclusive motion picture rights to a play constituted a "sale" for purposes of section 117. Judge Learned Hand said:

* * * Nor does it seem to me to be material that the exclusive license which the author granted to the Paramount Company did not convey "title" * * *.

Copyright and literary property are monopolies; they entitle the owner to prohibit various kinds of reproduction, and to relieve individuals of these prohibitions by licenses. The licenses may do no more than excuse what would otherwise be infringements; or they may be exclusive, as in the case at bar. An exclusive license requires the author to protect the licensee against other infringement, and is for the most purposes treated as "property." I think that it is "property" within § 117 (a) (1); that its grant is a "sale" * * *.

Columbia Pictures Corporation and Warner Brothers Pictures, Inc., acquired full beneficial ownership of the exclusive motion picture rights to "My Sister Eileen" and "The Doughgirls," respectively, under their agreements with the petitioner; they received "actual command of the property." The petitioner retained nothing but the naked legal title. Mr. Justice Holmes, in *White-Smith Music Co.* v. *Apollo Co.*, 209 U. S. 1, 18, 19, which involved substantive questions of copyright law, said: .

The notion of property starts, I suppose, from confirmed possession of a tangible object and consists in the right to exclude others from interference with the more or less free doing with it as one wills. But in copyright property has reached a more abstract expression. The right to exclude is not directed to an object in possession or owned, but is *in vacuo*, so to speak. It restrains the spontaneity of men where but for it there would be nothing of any kind to render their doing as they saw fit.

See also *Photo Drama Motion Picture Co.* v. *Social Uplift Film Corporation*, *supra*, at page 378.

The agreements transferring the exclusive motion picture rights to the plays gave the motion picture companies "the right to exclude others from interference with the more or less free doing" with them as the transferees willed. For the duration of the monopoly granted by the Copyright Act, the motion picture companies could assert their monopoly of their respective motion picture rights against the world, including the petitioner himself. Although the transferors retained the power, under the Copyright Act, to sue for damages for infringement of the exclusive motion picture rights, under the agreements this power could be exercised only for the benefit of the transferees. The motion picture companies also had the power, themselves, to sue for infringement of their exclusive rights by the simple formality of joining the "owners" as nominal parties plaintiff. *Page & Co.* v. *Fox*

*Film Corporation, supra; Stephens v. Howells Sales Co., supra.* The grants to the motion picture companies were not limited as to either territory or time; they were "world-wide" and "forever." The companies, in both transactions, were given the right to freely alienate the interests which they received. The language used throughout both agreements is that of sale and outright conveyance, and this was obviously the intention of the parties. In both agreements the owners of the motion picture rights expressly "grant," "sell," "assign" and "set over," "forever," the "exclusive" motion picture rights throughout the "entire world." In each agreement the "owners" appoint the purchaser their irrevocable attorney, for his sole benefit, to enforce and protect all rights transferred to the purchaser, and they give the purchaser the right to sell, assign, transfer and grant the motion picture rights, or any part thereof, without limit. Each agreement expressly recites that it shall be binding not only upon the parties thereto, but also upon their respective heirs, executors, administrators, successors, and assigns.

The case of *Wodehouse v. Commissioner*, 337 U. S. 369, is clearly distinguishable from the present proceeding. That case involved a nonresident alien, not engaged in trade or business within the United States, who received lump sum payments in exchange for the exclusive serial or book rights throughout the United States to certain literary properties. The payments received were held to constitute "gross income from sources within the United States" as used in sections 119 (a), 211 (a), and 212 (a) of the Internal Revenue Code. The majority decision did not consider the inherent nature of a copyright or whether or not it was divisible. Rather, it pitched its consideration of the taxability of the payments upon fiscal practice as indicated by the special treatment given by Congress over the years to the taxation of the income of nonresident alien individuals. The rationale of the decision was that under the Revenue Act of 1934 sums received by a nonresident alien for the use of a copyright in the United States constituted taxable gross income, and that the Revenue Act of 1936 made it clear that "receipts from royalties, as expressly and broadly defined in section 119 (a) and subjected to withholding at the source of income under section 143 (b)" were included in income from sources within the United States as defined in section 211 (a). The Court said (337 U. S. 369, at pp. 390–1):

* * * No suggestion appears that Congress intended or wished to relieve from taxation the readily accessible and long-established source of revenue to be found in the payments made to nonresident aliens for the use of patents or copyrights in the United States. * * * To have exempted these nonresident aliens from these readily collectible taxes derived from sources within the United States would have discriminated in their favor against resident citizens of the United States who would be required to pay their regular income tax on such

income, if treated as royalties within the meaning of our gross income provisions, or at least to pay a tax upon them as capital gains, if treated as income from sales of capital within the meaning of our capital gains provisions. No such purpose to discriminate can be implied.

In *Rohmer* v. *Commissioner*, 153 Fed. (2d) 61, 65, affirming 5 T. C. 183; certiorari denied, 328 U. S. 862, which involved facts similar to the *Wodehouse* case, the court distinguished between section 117, under which the question in this proceeding arises, and section 211, which was involved in that case as it was in the *Wodehouse* case:

\* \* \* Because of the differing histories and purposes of section 117 and section 211 (a) (1) (A), respectively, we think that the views expressed by the majority in the *Goldsmith* case have no bearing here. It is well to remember that the concepts employed in construing one section of a statute are not necessarily pertinent when construing another with a distinguishable background.

The grants of the motion picture rights to the plays, "My Sister Eileen" and "The Doughgirls," while not disposing of all the property in the copyright of those plays, did dispose of all the petitioner's property in the motion picture rights. Such a grant is a "sale" for the purposes of section 117.

Having arrived at the conclusion that the transfer of the motion picture rights constituted a "sale" for the purposes of section 117, there remains the question of whether the proceeds realized are taxable as long term capital gains under section 117 (j). The applicability of section 117 (j) to facts similar to those present in this proceeding is before us for the first time. Since the petitioner has failed to show that the motion picture rights were used by him in his trade or business, we believe that the respondent was correct in his determination that the proceeds from the transfer of the motion picture rights are not taxable as long term capital gains.

Under section 117 (a) (1) the term "capital assets" does not include, among other exclusions, "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" and "property, used in the trade or business, of a character which is subject to the allowance for depreciation." Admittedly, the property in question is not a capital asset because of these exclusionary clauses. The petitioner, however, argues that the payments that he received are taxable as capital gains under section 117 (j), which provides that "recognized gains upon sales or exchange of property used in the trade or business" and held for more than six months, "shall be considered as gains \* \* \* from sales or exchanges of capital assets held for more than 6 months." "Property used in the trade or business" is defined to mean (1) "property used in the trade or business, of a character which is subject to the allowance for depreciation," and (2) real property used in the trade or business.

But there is a difference between property *used* in the trade or business and property *held primarily for sale* to customers. These are two mutually exclusive purposes; property can not be held for use and for sale at the same time. Section 117 (a) (1), in its exclusionary clauses, recognizes this difference, the difference between, for example, machinery used in the business to manufacture goods and the goods manufactured which are held for sale to customers. "Property used in the trade or business, of a character which is subject to the allowance for depreciation" was first incorporated into section 117 as an exclusion from the definition of capital assets by the Revenue Act of 1938. Prior to that time, capital assets had been defined to exclude "stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." The Revenue Act of 1942 added section 117 (j) which allowed gains from the sale of depreciable property used in the trade or business to be treated as capital gains. House Report No. 2333, 77th Cong., 1st sess., to accompany the Revenue Bill of 1942 (p. 45), explained the insertion of this provision:

> Under the existing law, the gain or loss from the sale or exchange of depreciable property is not treated as a capital gain or capital loss, but as an ordinary gain or an ordinary loss. This rule was originally inserted as a relief provision to enable corporations to have the full benefit of a loss from the sale of machinery, instead of being limited by the capital loss provisions, which would permit it only a certain percentage of the loss. It was felt at that time that the taxpayer should not be denied the full loss because it sold the property at a loss instead of abandoning the property. While this rule provided relief in case a loss was realized, it appears that many taxpayers are able to dispose of their depreciable property at a gain over its depreciated cost. To treat such a gain as an ordinary gain will result in an undue hardship to the taxpayer. * * *

*Albright* v. *United States*, 173 Fed. (2d) 339, considered the question of whether the normal sale of livestock, for the purpose of maintaining his herd at a regular size, by a farmer whose principal income was derived from the sale of dairy products and hogs could be treated as the sale of capital assets under section 117 (j). In deciding that the provisions of section 117 (j) were applicable, the court held that the animals culled from the herd were actually used in the taxpayer's business and were not held primarily for sale to customers in the ordinary course of his trade or business. The test used by the court was that:

> In order for the taxpayer to come within the provisions of section 117 (j) permitting him to treat the sales from his dairy and breeding herds as sales of capital assets, the burden is upon him to show * * * that the animals were not held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

See also *Nelson A. Farry*, 13 T. C. 8.

In *Goldsmith* v. *Commissioner, supra*, which involved facts similar to those in this proceeding, the court said that the copyright of the play in that case was not property used in the trade or business of the playwright, but, instead, was property held by him primarily for sale to customers. See also *Harold T. Avery*, 47 B. T. A. 538; Regulations 111, sec. 29.117–7; cf. *Walter G. Morley*, 8 T. C. 904.

The petitioner in this proceeding has not shown that he was in a position to exploit the motion picture rights personally, or that he had done so in the past or contemplated doing so in the future with other literary works. He was not engaged in the highly technical business of making motion pictures. He has not shown that the motion picture rights to the plays in question were used by him in his trade or business. Rather, the motion picture rights were held primarily for sale to customers, in this case motion picture companies, in the ordinary course of his trade or business.

It is held that the proceeds from the transfer of the motion picture rights to the plays, "My Sister Eileen" and "The Doughgirls" can not be treated as long term capital gains under section 117 (j), but, instead, are includible in the ordinary income of the petitioner for the years in which received.

*Issue 2.*—The petitioner claims a deduction under section 23 (u) of the Internal Revenue Code for the payments made by him in 1943 to his wife as alimony *pendente lite* from the time she instituted suit for legal separation in May, 1943, until a decree of separation was entered on December 21, 1943.

The right to a deduction under section 23 (u) depends upon whether or not the payments in question come within the scope of section 22 (k) so as to be includible in the gross income of the wife.

This question was considered in *George D. Wick*, 7 T. C. 723; affd., per curiam, 161 Fed. (2d) 732, in which this Court held that payments of alimony *pendente lite* which are made prior to the entry of a decree of divorce or of legal separation are not taxable to the wife under section 22 (k) and, therefore, are not deductible by the husband under section 23 (u). See also *Smith* v. *Commissioner*, 168 Fed. (2d) 446; *Robert L. Daine*, 9 T. C. 47; affd., 168 Fed. (2d) 449. The facts on this issue are substantially the same as the facts in *George D. Wick, supra*. See also *Terrell* v. *Commissioner*, 179 Fed. (2d) 838.

It is held that the payments *pendente lite* which the petitioner made to his wife in 1943 are not deductible. The respondent's determination under this issue is sustained.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*