Wilma M. Imm v. Commissioner. Lewis W. Imm v. Commissioner.
Imm v. Comm'r
Docket Nos. 25736, 25738, 25737, 25739.
United States Tax Court
1952 Tax Ct. Memo LEXIS 284; 11 T.C.M. (CCH) 258; T.C.M. (RIA) 52080; March 24, 1952
*284 1. Held, amounts received in payment for sale of rights to inventions were capital gains. 2. Held, amounts paid to purchase claims and to clear title to inventions were capital expenditures. Edward J. O'Connor, Esq., 530 W. 6th St., Los Angeles 14, Calif., and Theodore H. Lassagne, Esq., for the petitioners. William P. Flynn, Jr., Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined income and victory tax deficiencies as follows: Petitioner
Docket No.
Year
Deficiency
Wilma M. Imm
25736
1943
$4,578.28
1944
1,933.91
25738
1947
540.19
Lewis W. Imm
25737
1943
4,537.01
1944
1,876.71
25739
1947
521.19
*285 The questions presented are whether amounts received by petitioners in the taxable years were capital gains or ordinary income, and whether certain payments made in 1943 and 1944 were deductible as expenses. Findings of Fact The petitioners are husband and wife, living in California, and the returns for the periods here involved were filed with the collector of internal revenue for the sixth district of California, at Los Angeles. All of the income in controversy was community property under the laws of California. Lewis W. Imm, hereinafter sometimes referred to as the petitioner, invented a device called a balance computer in the early part of 1937, which was patented in 1939. The petitioner, an aeronautical engineer, produced balance computers on a small scale as a sole proprietorship, known as the Librascope Development Company, sometimes herein called the Company. To obtain a better financial position, Librascope, Incorporated, hereinafter sometimes called Librascope, was organized under California law by the petitioner in 1939 to produce computers. All of the assets of the Company were transferred to Librascope, the corporation of which petitioner was president. In exchange *286 for an exclusive license agreement to manufacture, sell or rent balance computers, Lewis Imm acquired 6,000 shares from the corporation in 1939. He received 6,000 more shares in 1940 for promotional services. These 12,000 shares constituted two-thirds of the corporate stock. In January, 1940 and February, 1941, respectively, the petitioner applied for patents on a power computer and a balance computer, in addition to the first balance computer. After conferences and discussions with Navy personnel in 1940, a contract was given Librascope for the construction of 50 barrage computers, another of petitioner's inventions for which a patent was later sought. In April, 1940, Thomas F. Joyce, Jr., loaned $5,000 to Librascope, and by letter agreement agreed to loan an additional $20,000 in consideration of the assignment by petitioner to the corporation of title to all of petitioner's patents and applications. The petitioner agreed to be bound by the terms of the contract. Under the agreement, Joyce was also to receive, as consideration, 49 per cent of 94 per cent of the entire authorized stock of the corporation. The additional $20,000 was advanced to the corporation, but, in the meantime, *287 other funds were acquired by means of loans from the International Projector Corporation, sometimes herein called International. The terms of the agreement with Joyce were never carried out because the persons interested in the corporation could not agree upon a division of the stock. The additional money was required to carry out a proposed increase in capitalization due to the increased demand for computers during the war years. International offered to finance the business if it could own Librascope outright and make it a wholly-owned subsidiary. The minority stockholders of Librascope agreed to be paid $1.15 per share for their stock and Joyce agreed to accept $30,000 for his interests, in addition to repayment of the $25,000 he had loaned. An agreement was reached between the petitioner and International to pay the amount Joyce asked for. International agreed to supply the money to buy out Joyce. The petitioner agreed to pay half of the $30,000 that Joyce was to receive. On October 29, 1941, Librascope and Joyce entered into an agreement by which Librascope was to pay Joyce $30,000. Joyce assigned to International all of his title, interest and equity in the letter agreement *288 of April, 1940, his stock rights, causes of action and all legal and equitable claims against Librascope or its officers, in consideration of payment of the $25,000 debt. The agreement between Joyce and Librascope was amended in June, 1942, to allow Librascope the option to terminate its liability by paying Joyce $25,000. Librascope elected to take this option in December, 1942. On October 29, 1941, the petitioner received a release from Joyce. On November 12, 1941, the petitioner, as sole owner of his computer inventions, and Librascope entered into a contract to cancel the 1939 license agreement and to transfer all right, title and interest in petitioner's inventions, patents and applications to Librascope and to assign all future computer inventions to that corporation. In payment therefor Librascope agreed to pay the petitioner a royalty of 5 per cent of the net receipts from sales and leases in respect to every computer manufactured under any one of the unexpired patents. The petitioner sold all his stock in Librascope to International as part of the November 12, 1941, transaction. Petitioner also executed a supplemental agreement on November 12, 1941, with Librascope, in *289 which he agreed to pay Librascope $15,000 out of royalties forthcoming to him, and Librascope released the petitioner from personal liability on the April, 1940 agreement with Joyce. In January, 1943, the petitioner paid Librascope $8,000 and in December of the same year he paid an additional $5,000. In April of 1944 Librascope deducted $2,000 from payments due the petitioner. In their income and victory tax returns for 1943 and 1944, in determining gain on the sale of patents to Librascope, petitioners deducted $13,000 and $2,000 as expenses. The sale of the patent, invention and applications on November 12, 1941, was treated as the sale of a long-term capital asset. In 1943, 1944 and 1947, the petitioner received payments from Librascope for the patent, invention and applications which he returned as long-term capital gains. The respondent determined that the community shares of the amounts received from the sale of patent, invention and applications were ordinary income and not capital gains. The deductions of $13,000 in 1943 and $2,000 in 1944 were disallowed by the respondent. The statements supporting the notices of deficiencies for the years 1943 and 1944 state that gross *290 income was increased by the amounts received under an agreement dated November 12, 1941, and supplements thereto. The statements in regard to 1947 do not mention supplements to the November 12, 1941 agreement. The respondent's answer in all four cases admits that: "* * * in November, 1941, the petitioner, Lewis W. Imm, as owner of certain inventions relating to computers, entered into a written agreement with a corporation known as Librascope, Incorporated, pursuant to which said Lewis W. Imm transferred to and conferred upon Librascope, Incorporated, certain property rights and privileges as in said agreement provided, and received therefor [the amounts in controversy here] * * *." Opinion VAN FOSSAN, Judge: There are two issues for decision in these proceedings. The facts may be briefly summarized. Petitioner invented several computers which provied useful to the Armed Services during World War II. He manufactured these devices on a small scale until, in 1939, he organized Librascope, Inc., which was licensed to make, sell and rent balance computers. In order to get needed capital the petitioner agreed in April, 1940 to assign all of his invention rights to the corporation *291 as part of a transaction wherein $25,000 would be borrowed from Thomas Joyce. In return Joyce was to receive stock in the corporation. Joyce lent the money but the other terms of the agreement were never carried out. Librascope borrowed further funds from International Projector Corporation. The latter corporation expressed its willingness to finance the manufacture and sale of petitioner's computers if it could control Librascope, Inc. To accomplish this end, International and Imm agreed to pay Joyce $30,000 for his claims, with each party paying half the price. On October 29, 1941, Librascope agreed to pay Joyce $30,000. Joyce assigned to International all of his title, interest and equity in the letter agreement of April, 1940, his stock rights and legal and equitable claims against Librascope and its officers. The agreement between Librascope and Joyce was later amended and Joyce eventually received payment in 1942. On November 12, 1941, petitioner agreed to pay Librascope $15,000 from royalties to be received. He received a release from Librascope on his personal liability in the agreement with Joyce. The petitioner also received a release from Joyce from the same contract. *292 The November 12, 1941 agreement was a supplement to the sales agreement of the same date by which the petitioner sold all of his present and future computer rights and patents to Librascope. On the same day he also sold all of his stock in the corporation to International. He was to receive, under the terms of the agreement of sale of the inventions, a 5 per cent royalty of the net receipts from the sales and leases of the computers. In 1943 and 1944, the petitioner paid the $15,000 owed to the corporation In 1943, 1944 and 1947, he received payments upon the sale of November 12, 1941. The first question is whether the sale by petitioner of his patent, invention and applications on November 12, 1941, resulted in ordinary income or capital gain under section 117 of the Internal Revenue Code. [1]
*293 In disposing of all of the rights to his computer inventions, the petitioner sold his patent upon the balance computer which he had licensed Librascope to make, two patent applications and the barrage computer invention. We are of the opinion that capital gains treatment must be accorded to this sale whether the patent or invention or patent applications be classified as depreciable property used in petitioner's trade or business under section 117 (j) (1), I.R.C., or as capital assets under section 117 (a) (1), I.R.C. Regardless of whether the patent, invention and patent applications were property used in petitioner's trade or business of a character subject to the depreciation allowance (a necessary requisite under section 117 (j) (1), I.R.C., but, an excluding criterion under section 117 (a) (1)), all other requirements of capital gains treatment are met. The petitioner's period of holding exceeds six months inasmuch as this period is measured from the time that the inventions in each instance were reduced to practice. Samuel E. Diescher, 36 B.T.A. 732, affirmed 110 Fed. (2d) 90; G.C.M. 21507, *294 Cum. Bull. 1939-2, p. 189. The patent, invention and applications were not stock in trade nor includible in petitioner's inventory, and, contrary to respondent's argument, Lewis Imm did not hold the rights to his inventions primarily for sale to customers in the ordinary course of his business. In 1941 the petitioner's business consisted of inventing computers, licensing their production and manufacturing them through Librascope, Inc. There is no evidence of prior or subsequent sales of patents or inventions by petitioner. His 1940 agreement with Joyce concerning the assignment of his patents to Librascope had never been carried out and Joyce received $30,000 in addition to repayment of his loan. The respondent relies upon Fields v. Commissioner, 189 Fed. (2d) 950, affirming 14 T.C. 1202. The reliance, however, is misplaced. Unlike Fields' dependence as a playwright upon others to produce his plays, petitioner was capable of and manufactured products based on his own inventions. In no real sense was petitioner dependent upon selling the rights to his inventions as is a playwright in order to obtain financial return for his work. The fact that petitioner *295 later sold the rights to his inventions to a single corporation which he had founded and which was undergoing expansion, does not impair the conclusion that he was not in the business of selling patents or inventions. Nor does the fact that payment in the form of royalties was periodic affect the validity of our conclusion that capital gain rather than ordinary income was received from the sale. Halsey W. Taylor, 16 T.C. 376. The second issue involves the payment of $15,000 over a 2-year period to Librascope, Inc. by petitioner. The petitioner seeks to deduct this amount as an expense of the sale of the rights to his inventions. In order to obtain the financial backing of International, it became necessary to purchase the claims of Joyce against Librascope and the petitioner. The payment was a condition precedent to International's purchase of the Librascope stock and of Librascope's purchase of petitioner's patent, invention and applications. When the claims were purchased it was International to which Joyce's interests were assigned. However described, the payment must be considered a capital expenditure in determining the gain upon sale of the invention rights to *296 Librascope. Purchase of a release of Joyce's claim not only freed petitioner and Librascope from damage suits but also cleared the title to the inventions. The agreement of sale of November 12, 1941, required the petitioner to transfer all title, right and interest in the inventions to Librascope. By eliminating Joyce's claims against the inventions, petitioner was able to meet this requirement. Imm was personally liable to Joyce to transfer all of the petitioner's rights in his inventions and patents to Librascope and to issue to Joyce a large portion of stock in that corporation. To eliminate this claim against himself and to lift the cloud upon his ownership of all rights in the invention he agreed to make the payment of $15,000. It is not of determinative significance that Librascope had made an agreement to pay Joyce $30,000 before the petitioner signed an agreement to pay his half of that amount. Nor is it conclusive that Librascope paid Joyce under an amended agreement while petitioner paid his share out of royalties received from Librascope. The realities of the situation may be obscured by the arrangements between the parties but it is substance and not form which is decisive. *297 The expenditure of the $15,000 must be considered a capital expense of clearing title to the inventions. As such an expenditure, it must be taken into account in determining the gain upon the subsequent sale. Cf. W. B. Davis & Son, Inc., 5 T.C. 1195, Reg. 111, Sec. 29.24-2. Decisions will be entered under Rule 50. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), * * *
(j) Gains and Losses from Involuntary Conversion and from the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, or a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Such term also includes timber with respect to which subsection (k) (1) or (2) is applicable. (2) General Rule. - If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. * * *↩