WALTER B. WEIMER AND DONNA S. WEIMER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; WILLIAM M. MORRIS AND LAURENE S. MORRIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Weimer v. Commissioner
Docket Nos. 19633-81; 19634-81.
United States Tax Court
T.C. Memo 1987-390; 1987 Tax Ct. Memo LEXIS 387; 54 T.C.M. (CCH) 83; T.C.M. (RIA) 87390; August 10, 1987. Harry F. Klodowski, Jr. (appeared specially), for the petitioners. Francis J. Emmons, for the respondent. CANTREL
MEMORANDUM OPINION CANTREL, Special Trial Judge: This matter is before the Court on respondent's *389 Motion for Partial Summary Judgment pursuant to Rule 121, Tax Court Rules of Practice and Procedure.[1] The issues raised by the motion are: (1) whether an agreement executed by the Red Falcons Company, L.P. (Red Falcons) effected a sale of a portion of Red Falcons' rights in a copyright, (2) if not a sale, whether the agreement constitutes "leasing any section 1245 property," within the meaning of section 465(c)(1)(C) of the Internal Revenue Code of 1954, as amended, [2] and (3) whether Red Falcons is entitled to a depreciation deduction in 1977 based on the income forecast method. [3]
*390 The following material facts are established by the pleadings, admissions and other acceptable materials. Respondent determined the following deficiencies in petitioners' Federal income taxes: Docket No.
Petitioners
Year
Deficiency
19633-81
Walter B. Weimer and
1976
$ 5,612.59
Donna S. Weimer
1977
3,855.55
19634-81
William M. Morris and
1976
9,321.31
Laurene S. Morris
1977
3,833.28
When they filed their petitions in these cases, petitioners Walter B. and Donna S. Weimer, husband and wife, resided at Washington, Pennsylvania, and petitioners William M. and Laurene S. Morris, husband and wife, resided at Pittsburgh, Pennsylvania. Mr. and Mrs. Weimer and Mr. and Mrs. Morris filed their Federal income tax returns for tax years 1976 and 1977 with the Internal Revenue Service Center at Philadelphia, Pennsylvania. Petitioners, Walter B. Weimer and William M. Morris, are limited partners in Red Falcons, a Delaware limited partnership formed in 1976. Red Falcons was organized for the stated purpose of acquiring and exploiting the manuscript and copyright to The Red Falcons by Al Dempsey and Robin Moore. *391 The operations of Red Falcons were conducted by its general partner, James C. Blackman. Mr. Blackman is an attorney in Warren, Pennsylvania and has practiced law since 1972. As organized, Red Falcons had 25 limited partnership interests of $ 8,000 each. The minimum subscription was one limited partnership interest requiring a $ 3,200 cash payment at the time of subscription and the execution of a negotiable promissory note of $ 4,800 payable on January 15, 1977. The general partner was to be paid a guaranteed initial management fee of $ 2,000 and was to contribute $ 2,000 to the capital of Red Falcons. Profits and losses were allocated 99 percent to the limited partners and 1 percent to the general partner. On August 15, 1976, petitioner Walter B. Weimer subscribed to two limited partnership interests and petitioner William M. Morris subscribed to one limited partnership interest. On October 1, 1976, Red Falcons entered an agreement with Robin Moore and The Moorings of Nassau, Ltd., Inc. for the purchase of the original manuscript entitled The Red Falcons.[4] The purchase agreement by its terms purported to convey to Red Falcons all the rights inhering in the manuscript *392 including "the common law copyright together with all other property, rights, title and interest of whatsover nature, whether now or hereafter known * * *." The stated purchase price was $ 812,500 payable as follows: 1) $ 25,000 cash downpayment at closing, 2) $ 100,000 nonrecourse partnership note bearing 6 percent interest per annum, payable on or before January 31, 1977, and 3) $ 687,500 nonrecourse partnership note bearing 8 percent interest per annum, payable seven years from the closing date. The $ 100,000 nonrecourse partnership note was secured by the manuscript itself (including copyright rights) and the limited partners' recourse notes payable on January 15, 1977. The $ 687,500 nonrecourse partnership note was secured by the manuscript and payable solely from 50 percent of the gross receipts realized by Red Falcons from exploitation of the manuscript. The agreement specified that in the event of nonpayment and foreclosures against the property, any agreements executed *393 by Red Falcons for the purpose of exploiting the property would remain in full force and effect. As a condition to the closing of title under the purchase agreement, it is specified that Red Falcons must have entered into an agreement with a publisher for the national distribution of the book. In accord with the condition, a publishing agreement between Red Falcons and Pinnacle Books, Inc. (Pinnacle) was executed on October 1, 1976, the same day the purchase agreement was executed. The agreement was executed using Pinnacle's standard form contract and was modified by the parties. Pertinent provisions of the agreement with Pinnacle read as follows: In consideration of the mutual covenants herein contained, the parties agree as follows: 1A. The Author [Red Falcons] hereby grants and assigns to the Publisher [Pinnacle] (its successors and assigns) with respect to the Author's literary work now entitled, THE RED FALCONS by Robin Moore and Al Dempsey (hereinafter called the Work), which title may be changed by mutual consent, the following exclusive rights: to publish and sell or authorize others to sell the Work in the English language in book form under its own name and *394 under its various trade names and imprints, and the rights listed in Articles 9A and 9B, in the following territory: throughout the world. 1B. Subject to the provisions herein with respect to earlier termination, all rights granted under this Agreement shall remain in effect during the full term that copyright to the Work sustains (including any renewal period) in any country in the world. The Author shall, when requested by the Publisher, execute all documents which may be necessary or appropriate to enable the Publisher to exercise or deal with the rights granted hereunder. * * * 9A. All revenue derived from the sale of the following rights-books club, hardcover book selection, second serial, syndication, excerpt, abridgement, condensation, digest, textbook, British Empire editions, foreign translations, low-priced editions and premium editions (other than low-priced and premium editions published by Publisher) -- shall be shared equally between the Author and the Publisher, provided that a deduction shall be made from the gross receipts under such rights for any direct expenses (other than the normal general overhead expenses) incurred by the Publisher in exercising *395 or disposing of such rights before such division is made. 9B. All revenue derived from the sale of the following rights shall be divided as follows: All Dramatic Rights
90% to Author
10% to Publisher
All Motion Picture Rights
90% to Author
10% to Publisher
Radio Rights
90% to Author
10% to Publisher
Television Rights
90% to Author
10% to Publisher
First Serial Rights
70% to Author
30% to Publisher
Commercial Rights
90% to Author
10% to Publisher
Recording Rights
90% to Author
10% to Publisher
9C. The Publisher shall have the sole and exclusive right to dispose of or exercise any or all of the rights specified in Article 9A. * The Author shall have the sole and exclusive right to dispose of any or all of the rights specified in Article 9B. ** * * * [Reproduced literally.] In addition, the publishing agreement specifies, inter alia, that Pinnacle 1 -- copyright the book in the name of Red Falcons, 2 -- imprint all copies with copyright notice as required by law, 3 -- furnish to Red Falcons galley proof and, if requested, page proof, 4 -- make available *396 corrected proofs for Red Falcons' inspection, 5 -- determine the catalogue retail price, and 6 -- commence distribution by September 1976. [5]Pinnacle is also obligated under the agreement to provide various statements to Red Falcons regarding costs of proof corrections, license receipts and royalties and to make its books and records pertaining to the manuscript available for Red Falcons' inspection. Payments by Pinnacle to Red Falcons are generally required at the time the statements are rendered. The following termination provisions are set forth in the publishing agreement: * * * 16A. If the Publisher shall fail to comply with or fulfill the materials terms and conditions hereof, or in the event of bankruptcy, etc., as in Article 16D hereof provided, this Agreement shall terminate upon receipt by the Publisher of written notice to that effect from the Author and the rights herein granted to the Publisher shall revert to the Author. In such event all payments theretofore made to the Author shall belong to the Author *397 without prejudice to any other remedies which the Author may have. 16B. If the Publisher shall, during existence of this Agreement, default in the delivery of semi-annual statements or in the making of payments as herein provided and shall neglect or refuse to deliver such statements or make such payments, or any of them, within thirty (30) days after written notice of such default, this Agreement shall terminate at the expiration of such thirty (30) days without prejudice to the Author's claim for any monies which have accrued under this Agreement or to any other rights and remedies to which the Author may be entitled. 16C. In the event that after one or more years from the date of the first publication of said Work, the same in the opinion of the Publisher is no longer merchantable or profitable, it shall give three months notice to the Author of its desire and intention to discontinue publication; or in the event that after three years from the date of first publication in the Work shall not be in print and for sale and after written demand from the Author shall not within nine months be reprinted and offered for sale, then in either of these events the Author shall have *398 the right to terminate this Agreement and upon written notice to that effect by the Author to the Publisher, all rights granted under this Agreement shall revert to the Author. 16D. If a petition in bankruptcy shall be filed by the Publisher, or if the Publisher shall be adjudicated bankrupt by any court, or if the Publisher shall make an assignment for the benefit of creditors or shall take the benefit of any bankruptcy or insolvency Act, or if the Publisher shall liquidate its business for any cause whatsoever (except liquidation in connection with the transfer of all or a substantial part of the business to a transferee intending to carry on the publishing business), this Agreement shall terminate automatically without notice, and shall termination shall be effective as of date of the filing of such petition, adjudication, appointment, assignment or declaration or commencement of reorganization or liquidation proceedings, and all rights granted hereunder shall thereupon revert to the Author. * * * Under the publishing agreement, the copyright is to be held at all times in the name of Red Falcons; however, Pinnacle is authorized to take legal action to restrain copyright *399 infringement, and Red Falcons is obligated to furnish to Pinnacle any authorization or other documents necessary for the execution of Pinnacle's duties. Rights not granted under the agreement are specifically reserved to Red Falcons. The agreement states: * * * [r]eserved publication rights include, but are not limited to, the right to publish or cause to be published in any form, excerpts, summaries and novelizations of dramatizations and motion pictures of the Work, not to exceed seventy-five hundred (7500) words in length, to be used for advertising and exploitation of motion pictures and television motion pictures or dramatizations based upon the Work.
In addition, the agreement cannot be assigned without written consent except with respect to "any successor in interest to the Publisher who shall acquire all or a substantial part of the publishing properties of the Publisher with a view toward carrying on the business of publishing and who shall assume the obligations of the Publisher * * *." The publishing agreement obligated Pinnacle to pay Red Falcons an advance royalty of $ 10,000 and additional royalties based upon a percentage of the receipts generated from sales *400 of the book in excess of the advance royalty. The advance royalty was to be paid as follows: $ 2,500 on commencement of distribution and $ 7,500 on or before November 30, 1976. In October 1976 distribution by Pinnacle commenced. Over 16,000 copies of The Red Falcons were sold in 1976 and over 50,000 copies were sold in 1977. However, no additional royalties were payable to Red Falcons under the agreement after offset by the $ 10,000 advance royalty. Red Falcons' income from the book did not exceed $ 10,000 in 1976 and $ 0 in 1977. For purposes of computing and reporting its taxable income in each of the years, Red Falcons used the cash method of accounting and the calendar year. The following income and expenses were reported on Red Falcons' partnership returns for 1976 and 1977: 1976
1977
Gross Receipts
-0-
Royalties
$ 10,000
Interest Income
58
$ 1,042
Total Income
10,058
1,042
Depreciation
370,125
131,600
Taxes
7,005
Amortization
6,300
Other Deductions
10,138
2,795
Total Expenses
380,263
147,700
Net Loss
-370,205
-146,658
On its 1976 Federal income tax return, *401 Red Falcons elected the income forecast method of depreciation. No request was made for permission to change its method of depreciation for the book. A cost basis of $ 822,500 was used for purposes of depreciating the manuscript, including the copyright. The partnership's depreciation deductions of $ 370,125 and $ 131,600 in 1976 and 1977, respectively, were computed by multiplying the cost basis by a rate of .45 in 1976 and .16 in 1977. Petitioners, on their 1976 and 1977 Federal income tax returns, claimed their distributive shares of the partnership losses reported on Red Falcons' returns for 1976 and 1977. These amounts were disallowed by respondent in his notices of deficiency. The stated reasons for disallowance are petitioners' failure to establish: 1) that the alleged events, transactions, and expenditures ever occurred in fact or in substance, 2) that the venture was entered into for profit, or was in a trade or business or was otherwise held for the production of income, 3) that the underlying events or transactions were entered into for profit, or arose in a trade or business, 4) the adjusted basis of assets allegedly subject to depreciation and amortization *402 and the method of depreciation and amortization, 5) that the claimed losses were not in excess of your adjusted basis, 6) that any nonrecourse financing should be considered in determining your adjusted basis in the partnership or in determining the adjusted basis of the partnership's assets, [and] 7) that, with respect to the deductions claimed, all events have occurred which determine the fact of liability and the amount thereof with reasonable accuracy. Timely petitions and answers were filed by the parties and shortly thereafter, following a limited period of informal discovery, respondent filed a motion now under consideration. In his motion respondent requests summary adjudication of the following issues: 1. Whether an agreement between The Red Falcons Company, Limited Partnership, and Pinnacle Books, Inc., in which Pinnacle was granted the exclusive right to exploit a copyrighted manuscript entitled The Red Falcons in printed form throughout the world constituted a sale of that portion of the partnership's interest in the manuscript. 2. In the alternative, if the agreement between The Red Falcons and Pinnacle Books is found to be a license rather than a *403 sale, whether the licensing agreement constituted a "lease of section 1245 property" within the meaning of I.R.C. [section] 465(c)(1)(C) as in effect during 1976 and 1977. 3. Assuming that the agreement between The Red Falcons and Pinnacle Books is not found to be a sale, whether the depreciation allowance claimed by the partnership on its 1977 return should be disallowed in full on the grounds that the partnership elected to depreciate the manuscript on the income forecast method, and it received no taxable receipts from the manuscript during that year under its method of accounting. * * * In support of his motion respondent submitted affidavits with attached exhibits including copies of relevant tax returns, Red Falcons' Private Placement Memorandum, the purchase agreement dated October 1, 1976 between Red Falcons, Robin Moore, and The Moorings of Nassau, Ltd., and the publishing agreement dated October 1, 1976 between Red Falcons and Pinnacle. For purposes of ruling on the issues posed in his motion for partial summary judgment, respondent conceded that petitioners' documents -- pertaining to the formation of Red Falcons, the acquisition of the *404 manuscript entitled The Red Falcons, and the distribution of the manuscript -- reflect the truth and substance of Red Falcons' transactions. As to the issues that would remain in dispute after ruling on the motion, respondent has not abandoned his primary contention that the partnership's arrangements should be disregarded for Federal tax purposes. Petitioners resist summary adjudication of each of the three issues posed by respondent's motion. A formal objection was filed wherein petitioners submitted counter-affidavits and exhibits. Their primary contention is that material questions of fact remain unresolved and, therefore, summary judgment is inappropriate.
Sale of Print Rights
Respondent requests partial summary adjudication that the publishing agreement between Red Falcons and Pinnacle constituted a sale of the printing rights to the book entitled The Red Falcons. In support of his position on this issue, respondent relies primarily upon the express terms of the publishing agreement and the affidavit of Joseph Marks, a consultant in the publishing industry. In his affidavit, Mr. Marks supplies "generally accepted definitions" of terms used in the publishing *405 agreement. Respondent contends that the record contains all the facts needed to rule, as a matter of law, that the agreement effected a sale of a portion of Red Falcons' copyright. [6]
Petitioners' position on this issue is that Red Falcons remained the owner of the book after execution of the publishing agreement, i.e., the agreement did not convey any ownership interest in the copyright. In addition, the following reasons are advanced in opposition of summary judgment: 1 -- there are material issues of fact, 2 -- the legal issue is one of first impression and, therefore, disposition by partial summary judgment is inappropriate, and 3 -- the agreement constitutes, as a matter of law, *406 a contract for services. The affidavits of Juri Jurjevics, a consultant in the publishing industry, and James C. Blackman, Red Falcons' general partner, were submitted and relied upon for the purpose of illustrating material issues of fact and to show, alternatively, that respondent is not entitled to summary judgment as a matter of law. A decision will be rendered on a motion for summary judgment if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law. A partial summary adjudication may be made which does not dispose of all the issues in the case. Rule 121(b). The burden of proving that there is no genuine issue of material fact is on the moving party, and factual inferences will be read in a manner most favorable to the party opposing summary judgment. Adickes v. Kress & Co.,398 U.S. 144, 157 (1970); Drexel v. Union Prescription Centers, Inc.,582 F.2d 781, 784 (3d Cir. 1978). Whether or not facts are material depends upon the context in *407 which they are raised and the legal issues which exist between the parties. Casanova Co. v. Commissioner,87 T.C. 214, 217 (1986). However, a motion for summary judgment may not be defeated by the mere allegation that there is a dispute over a material fact; the adverse party must set forth specific facts showing that there is a genuine issue for trial. Rule 121(d); see Gauntt v. Commissioner,82 T.C. 96, 101 (1984), and cases cited therein. Our first inquiry is to determine whether respondent has carried his burden to show the absence of any genuine issue of fact. Rule 121(b). What is material, as previously noted, turns on the legal issue presented. See Casanova Co. v. Commissioner, supra.As such, we begin our analysis by surveying applicable case law. Cases which address the sale versus license dichotomy are legion. Our review of leading cases is undertaken solely for the purpose of illustrating factual issues that are material in ruling on respondent's motion and is not exhaustive. Respondent's litigating position is based upon the longstanding principle that an agreement cast in the form of an exclusive license may *408 be treated as a sale for tax purposes even if title remains with the grantor. See, e.g., Conde Nast Publications, Inc. v. United States,575 F.2d 400 (2d Cir. 1978); 575 F.2d 400 (2d Cir. 1978); E. I. du Pont de Nemours & Co. v. United States,432 F.2d 1052 (3d Cir. 1970); [7]Moberg v. Commissioner,305 F.2d 800 (5th Cir. 1962); Rollman v. Commissioner,244 F.2d 634 (4th Cir. 1957); Green v. Commissioner,83 T.C. 667 (1984); Bell Intercontinental Corp. v. United States,381 F.2d 1004 (Ct.Cl. 1967). The rationale is "If such grant is exclusive and perpetual, its characteristics more resemble a sale than a license * * *." Seattle Brewing & Malting Co. v. Commissioner,6 T.C. 856, 869 (1946), affd. 165 F.2d 216 (9th Cir. 1948). For purposes of Federal taxation, a sale occurs upon the transfer of the benefits and burdens of ownership, rather than upon the technical requirements for the passage of title. See Leahy v. Commissioner,87 T.C. 56, 66 (1986), *409 and cases cited therein. Sale treatment will result when there is a transfer of all substantial rights of value in the property transferred. Merck & Co. v. Smith,261 F.2d 162, 164 (3rd Cir. 1958); Durkin v. Commissioner,87 T.C. 1329, 1369 (1986); Tomerlin Trust, Transferee v. Commissioner,87 T.C. 876 (1986); Tolwinsky v. Commissioner,86 T.C. 1009, 1042-1043 (1986); Green v. Commissioner, supra.No sale occurs, however, if the transferor retains substantial proprietary rights in the property transferred. Consolidated Foods Corp. v. United States,569 F.2d 436 (7th Cir. 1978); Cory v. Commissioner,230 F.2d 941 (2d Cir. 1956), affg. 23 T.C. 775 (1955), cert. denied 352 U.S. 828 (1956). A retention of proprietary rights is inconsistent with sale classification. However, a retention of a right to receive payments based on a percentage of profits or on production is not inconsistent with a sale. Percentage payments, though in many respects like royalties under a license, are no less payments of purchase price than are fixed or lump sum payments. *410 Kimble Glass Co. v. Commissioner,9 T.C. 183, 190 (1947); cf. Cory v. Commissioner, supra; contra Consolidated Foods Corp. v. United States, supra at 441. Further, the retention of rights to terminate an agreement under certain conditions over which the transferor has no control, such as bankruptcy or nonpayment by the transferee, does not interfere with the passage of ownership. Such provisions are considered conditions subsequent and will not defeat a sale. See Young v. Commissioner,29 T.C. 850, 859 (1958), affd. 269 F.2d 89 (2d Cir. 1959); Kimble Glass Co. v. Commissioner, supra;Myers v. Commissioner,6 T.C. 258, 264 (1946); Bell Intercontinental Corp. v. United States, supra.The fact, too, that a transferee has the right to terminate at will does not defeat a sale, Bell Intercontinental Corp. v. United States, supra, nor will a provision prohibiting unlimited assignment. See Moberg v. Commissioner, supra.
Our survey of cases would not be complete without mentioning those that specifically address the divisibility aspect of *411 copyrights. The law pertaining to copyrights, as in effect in 1976, secured to the owner of a copyright the following exclusive rights: 1 -- to print, publish, and sell copies, 2 -- to translate, dramatize, convert into a novel, 3 -- to perform publicly, 4 -- to make transcriptions or records, to exhibit, and 5 -- to reproduce mechanically. 17 U.S.C. sec. 1, 61 Stat. 652, 1088; see Herwig v. United States,105 F.Supp. 384, 386 (Ct.Cl. 1952); Cory v. Commissioner,23 T.C. 775, 783-784 (1955), affd. 230 F.2d 941 92d Cir. 1956), cert. denied 352 U.S. 828 (1956). A copyright is comprised of a bundle of rights, and it is possible to have separate sales of any one of the exclusive rights which make up a copyright. See Herwig v. United States, supra at 389 (movie rights were sold separately from printing rights); Fields v. Commissioner,14 T.C. 1202 (1950), affd. 189 F.2d 950 (2d Cir. 1951) (movie rights to play copyright were sold separately). There is nothing inherent in the nature of a copyright which precludes the separate sale of the several parts which *412 make up a whole. 14 T.C. at 1211. [8] However, all substantial rights in a separate and distinct medium of publication must be transferred for a transaction to be treated as a sale of a portion of a copyright. See Conde Nast Publications, Inc. v. United States, supra at 404. Further, a grant transferring the exclusive right to exploit a copyright in medium of publication throughout the life of the copyright may under some conditions fail to have the required characteristics of a sale in cases where interests resembling royalties are retained by the copyright owner along with other rights in the transferred interest. See, e.g., Cory v. Commissioner, supra.[9]
*413 With the foregoing principles in mind, we turn to our record. Respondent's motion can be granted only upon a showing first, that all substantial rights in a specific medium of publication have been transferred from Red Falcons to Pinnacle and second, that Red Falcons retained no substantial proprietary rights which, viewed alone or in the aggregate, derogate from the publishing rights transferred to Pinnacle. These issues are factual in nature and material to a ruling that a sale of a portion of Red Falcons' copyright occurred as a matter of law. Respondent relies upon the publishing agreement and the affidavit of an expert witness to show that all substantial rights have been transferred and no proprietary rights have been retained. We have reviewed the agreement, and have considered respondent's interpretation, but must conclude that it is inadequate to support summary judgment. Our task in this proceeding is to determine whether there is any genuine dispute regarding the nature of the rights transferred and retained by Red Falcons. After analyzing the agreement and reading its terms in a light most favorable to petitioners, we are satisfied that material issues of fact exist *414 which can not be resolved on the basis of the agreement alone. The agreement, which we have previously reproduced in relevant part, purports to convey exclusive publishing rights for the term of copyright. However, a study of the agreement reveals provisions which are inconsistent with respondent's contention that a sale has occurred. For example, (a) Pinnacle agreed not to assign the agreement without Red Falcons' written consent; [10] (b) Pinnacle agreed to furnish Red Falcons with detailed monthly reports of sales and royalties; (c) upon request, Pinnacle's books and records pertaining to the manuscript were to be open to Red Falcons for inspection; (d) Pinnacle agreed to furnish galley and page proofs for Red Falcons' inspection, and to submit corrected proofs; (e) Pinnacle agreed to notify Red Falcons of its intent to discontinue publication; and (f) Red Falcons retained the power to terminate the agreement for Pinnacle's nonperformance of the agreement's material terms. We conclude that these provisions raise a material issue regarding the proprietary nature of the rights retained by Red Falcon. *415 Respondent argues that the rights retained by Red Falcons are in the nature of conditions subsequent or were made merely to secure the payment of royalties and, therefore, can not defeat sale treatment. We have considered the cases which support respondent's argument. [11] In our opinion these cases reinforce that restrictive provisions are important factors to be considered in determining whether substantial proprietary rights have been retained: none of the cases stand for the proposition that such provisions are to be disregarded. We simply can not presume that the rights retained by Red Falcons -- when viewed in the aggregate and in light of all facts and circumstances -- are insubstantial. [12] Our concern is the cumulative effect of the agreement's restrictive provisions. When viewed together the restrictive provisions are sufficient to raise a factual inference that Red Falcons retained proprietary rights. *416 Schmitt v. Commissioner,30 T.C. 322 (1958), affd. 271 F.2d 301 (9th Cir. 1959), supports our approach here. As in these cases, Schmitt involved the interpretation of an assignment of rights to use intangible property pursuant to a written agreement that contained restrictive provisions. After a study of the entire record, including evidence pertaining to the conduct of the parties, the Court found the assignor had retained, in the aggregate, continuing rights and interests that precluded recognizing the transaction as a sale. [13] The following language (30 T.C. at 334) is particularly responsive to respondent's argument that the retained rights can not defeat sale treatment: It is important to note that we do not rest our conclusion upon any one of petitioner's retained interests or powers, and, without doubt, there are cases in which the reservation of some similar powers and rights has been held not to be fatal. We hold that all of the rights, powers, and continuing interests reserved by petitioner, taken in combination, are of such character as to be inconsistent with a "sale or exchange" of property by petitioner *417 * * *. It is no answer to say that a number of the rights reserved by petitioner were merely to protect his interest in the system or to insure full payment for the assignments. That reason may explain why such reservations are made, but it does not detract from the conclusion that petitioner did not in fact dispose of all his substantial interest in the system by reason of such reserved rights when taken together with all other reserved rights, powers, and interests. Petitioners argue that Red Falcons retained substantial proprietary rights, and, drawing all inferences in petitioners' favor, we find that the agreement can support this interpretation. [14] As such, we can not conclude a sale occurred as a matter of law without first determining the nature of the rights pertained by Red Falcons. This issue should be resolved as a matter of fact by concession or stipulation by the parties or, after a trial, by the court. *418 We have identified a material issue of fact regarding the nature of the rights retained; therefore, we need go no further in response to respondent's sale theory. However, we add the following discussion because both parties devoted a majority of their argument, at the hearing and in their briefs, debating whether Red Falcons transferred all substantial rights in a separate and distinct medium of publication. In particular, the parties disagree on the effect of Red Falcons' first serial rights. On this matter the parties submitted supporting and opposing affidavits of two consultants in the publishing industry for the purpose of defining "first serial rights" and other technical terms in the agreement. Our purpose in this opinion is not to determine which of the two affidavits is correct. Rather, our purpose is to determine the material factual questions to be tried. See Shiosaki v. Commissioner,61 T.C. 861, 862 (1974). Where the meaning of the agreement is not plain and its terms are ambiguous, we must examine the agreement, its purposes, and the surrounding circumstances in order to determine if a sale was mutually intended. See Glen O'Brien Partition Co. v. Commissioner,70 T.C. 492, 500 (1978), *419 and cases cited therein. Upon examination of the publishing agreement, we find the granting clauses (at paragraphs 1A, 1B, 9A and 9B) unclear. We know important publishing rights have been assigned, but without resort to expert testimony, we are unable to discern whether the agreement, by its terms, operates to transfer all substantial print media rights. In such circumstances, summary adjudication is not appropriate. A motion for summary judgment will be granted if the Court is satisfied that no real factual controversy is present so that the remedy can serve "its salutary purpose in avoiding a useless, expensive and time consuming trial where there is no genuine, material fact issue to be tried." Casanova Co. v. Commissioner, supra, quoting Lyons v. Board of Education of Charleston,523 F.2d 340, 347 (8th Cir. 1975). However, when there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties. Peterson v. Lehigh Valley District Council, Etc.,676 F.2d 81, 84 (3d Cir. 1982). Here, it is likely that the publishing agreement will ultimately *420 be dispositive of the issue, nevertheless, the existence of ambiguous terms creates an issue of fact for trial. See American Fidelity & Casualty Co., Inc. v. London & Edinburgh Ins. Co.,354 F.2d 214 (4th Cir. 1965). [15]
Alternatively, respondent requests partial summary judgment that the publishing agreement between Red Falcons and Pinnacle constitutes a lease of section 1245 property subject to section 465 at risk limitations. [16] Respondent contends that if the publishing agreement did *421 not effect a sale, then it must be characterized as a license of intangible property. A license of intangible property, respondent argues, constitutes "leasing any section 1245 property" within the meaning of section 465(c)(1)(C). [17]
*422 In opposition, petitioners renew their contention that material issues of fact exist. They also assert summary adjudication is inappropriate on issues of first impression and, in any event, the publishing agreement constitutes a primary service contract as a matter of law rather than a sale or license. Generally, section 465(a) imposes a limitation upon the deductibility of losses arising from any activity specified in section 465(c). The at risk rules do not apply to all activities which may give rise to tax losses. The limitations apply only to those activities specifically enumerated. See Waddell v. Commissioner,86 T.C. 848, 899 and 914 (1986). While section 465(a) makes no direct reference to partners or partnerships, legislative history makes it clear that the at risk rules were intended to be applied to them. See sec. 465(a) and (c); Conference Committee Report accompanying H.R. 10612, S. Rept. 94-1236 (Conf.) (1976), 1976-3 C.B. (Vol. 3) 827; Peters v. Commissioner,77 T.C. 1158, 1163 n. 5 (1981). After a careful review of the record in this case, we conclude that respondent's second request for partial summary judgment *423 must be denied. Only a brief review of section 465 is necessary to identify a material factual gap in this record. We simply can not rule that section 465 at risk limitations apply as a matter of law without sufficient support in the record for a factual finding that Red Falcons was engaged in the activity of leasing section 1245 property. Throughout this proceeding respondent's primary contention has been that the publishing agreement between Red Falcons and Pinnacle effected a sale for Federal tax purposes. [18] To rule at this time that the at risk provisions apply to the transaction between Red Falcons and Pinnacle presupposes a determination that the publishing agreement constitutes a license for Federal tax purposes and not a sale. No such determination has been made. Herein we have determined only that summary adjudication of the sale issues does not lie. We have not rejected respondent's sale theory; in fact we agree the publishing agreement, by its terms, raises a serious question regarding Red Falcons' ownership of the copyright. This question should be resolved as a matter of fact before we undertake to rule on matters of law. Accordingly, respondent's second request *424 for partial summary judgment will be denied. 1977 Depreciation Deduction
Irrespective of the resolution of the foregoing issues, respondent submits he is entitled to summary adjudication regarding Red Falcons' 1977 depreciation deduction. Respondent's position is that Red Falcons validly elected to compute its copyright depreciation deduction using the income forecast method and, pursuant to that method, Red Falcons is entitled to no deduction in 1977 since in that year it received no income from the manuscript. Petitioners do not dispute the validity of their election to depreciate the copyright using the income forecast method. However, they argue this issue can not be resolved by summary adjudication because there is a material issue of fact. Petitioners contend "for purposes of this motion only" that Red Falcons "received a check in the amount of $ 7,500 in January, 1977." In support of their contention, petitioners rely upon the affidavit of James C. Blackman, Red Falcons' general partner, wherein he avers: Attached hereto as Exhibit 2 is a two-page document consisting of the front and back of a *425 Pinnacle check dated December 29, 1976, for royalties from the publication of The Red Falcons, and a copy of the deposit slip for the deposit of the check. [19] While I have no specific recollection of the date I received this check, it was my policy to deposit such checks very soon after I received them. It is my belief that I may not have received this payment until after January 1, 1977. On this record we are satisfied there is no genuine dispute pertaining to Red Falcons' income in 1977. Under the terms of the publishing agreement, Pinnacle was obligated to pay an advance royalty of $ 10,000 to Red Falcons in 1976. The $ 10,000 royalty payment was payable in installments: (1) $ 2,500 upon commencement of distribution, and (2) $ 7,500 on or before November 30, 1976. On its 1976 Federal income tax return Red Falcons reported $ 10,000 as income from royalties from the book. On its 1977 tax return Red Falcons reported no royalties or other taxable income pertaining to receipts emanating from the publication of the book. The only income reported *426 by Red Falcons in that year was interest income of $ 1,042. At no time in this proceeding have petitioners alleged that an error was made in filing Red Falcons' returns or that Red Falcons underreported its taxable income in 1977. The foregoing restatement of facts would be enough for us to conclude that there is no genuine dispute that Red Falcons had no income from the book in 1977. But there is more. In filing his motion for partial summary judgment respondent relied not only on Red Falcons' 1977 tax return, but also on petitioners' admission that Red Falcons' gross receipts from the book did not exceed $ 0 in 1977. In respondent's First Request for Admissions, respondent requested the following admission: (6) The partnership's gross income from the book, computed on a cash basis, did not exceed the amounts indicated below for the corresponding years: Year
Gross Income
1976
$ 10,000.00
1977
-0-
1978
-0-
Petitioners replied: (6) Respondent's Request No. 6 is denied as stated. The gross receipts from the book did not exceed the amounts set forth by Respondent; there was, however, other income received by the partnership during the years *427 set forth. Petitioners argue, "A fair reading of the Response indicates that Petitioners did not admit that they received no royalty income in 1977." We reject this argument. Petitioners' admission that no gross receipts were received pertaining to the book in 1977 is broad enough to subsume the possibility that royalties were received in that year. Under the terms of the publishing agreement "royalties" are determined as a percentage of gross receipts from sales of the book. Further, petitioners' admission conforms with the income from the book reported on Red Falcons' returns, i.e., $ 10,000 in 1976 and $ 0 in 1977. "Other income" reported on Red Falcons' returns consisted of interest income of $ 58 in 1976 and $ 1,042 in 1977. We are satisfied that petitioner's admission does not draw a distinction between royalties and other receipts emanating from the publication or the book. [20]
*428 Petitioners' reply is a clear admission that Red Falcons' income from the book in 1977 was $ 0. Rule 90(f) states: (f) Effect of Admission: Any matter admitted under this Rule is conclusively established unless the Court on motion permits withdrawal or modification of the admission. Subject to any other orders made in the case by the Court, withdrawal or modification may be permitted when the presentation of the merits of this case will be subserved thereby, and the party who obtained the admission fails to satisfy the Court that the withdrawal or modification will prejudice him in prosecuting his case or defense on the merits. * * *
At no time have petitioners filed a motion to amend or supplement their admission, and we will not permit petitioners to unilaterally undo what has been admitted. The effect of petitioners' admission is to conclusively establish the matter. Rule 90(f). "Only for purposes of this motion" petitioners contend that Red Falcons received a check for royalties of $ 7,500 in 1977 and argue the record is sufficient to show that Red Falcons "may" have had income in 1977. We disagree. To us, the record shows an attempt to manipulate facts solely *429 for the purpose of defeating respondent's motion. In requesting partial summary judgment respondent properly relied on petitioners' admissions as well as other documents which verify that no income from the book was received by Red Falcons in 1977. There are no material issues of fact which preclude consideration of respondent's third request for partial summary judgment. Section 167(a) provides that there shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) of property used in a trade or business or held for the production of income. Petitioners have admitted that the income forecast method of computing depreciation is an acceptable method of recovering the cost of Red Falcons' interest in the copyright, and they do not dispute the applicability of the method in these cases. Red Falcons elected to use the income forecast method, therefore it was required to use that method as prescribed by the Commissioner. See Greene v. Commissioner,81 T.C. 132, 139 (1983). The income forecast method requires the application of a fraction, the numerator of which is income *430 from the depreciable asset for the taxable period, and the denominator of which is the estimated total income from the asset during its useful life. The cost of the depreciable asset is multiplied by such fraction to calculate the depreciation allowed for the taxable period. For such method, the term "income" means the taxpayer's net, rather than gross, income. See Durkin v. Commissioner,87 T.C. 1329, 1374 (1986), and cases cited therein. Under the income forecast method, if the depreciable property does not generate net income during a taxable year, no depreciation deduction is allowable for that year. Fife v. Commissioner,82 T.C. 1, 8-9 (1984); Greene v. Commissioner, supra; Wildman v. Commissioner,78 T.C. 943, 951 (1982); Siegel v. Commissioner,78 T.C. 659, 693 (1982). For its 1977 taxable year, Red Falcons claimed a depreciation deduction for its interest in the copyright although in that year it reported no income from the book. We have determined Red Falcons improperly calculated its depreciation deduction in that year under the income forecast method. Properly calculated, the numerator is zero *431 for the 1977 taxable year. Thus, even if we determine that Red Falcons has a depreciable interest in the copyright, its depreciation deduction for the copyright in 1977 would be zero.
Service Contract
As a final matter we address petitioners' argument that the publishing agreement is neither a sale, nor license, but a primary service contract. We address petitioners' service contract theory pursuant to our authority under Rule 121(c) to ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. [21]
*432 On this record a material issue remains unresolved whether the publishing agreement should be characterized as a sale or license for Federal tax purposes. We have previously noted that the agreement can support more than one interpretation. [22] Under the terms of the agreement, we identify two possibilities: 1 -- the agreement effected a sale of a portion of Red Falcons' copyright, or 2 -- the agreement effected a license to Pinnacle to use the copyright. Petitioners suggest a third possibility, i.e., the publishing agreement effected a primary service contract. Two factors must be demonstrated before we will characterize a transaction as a service contract for tax purposes: (1) control over the activities by the property owner, and (2) risk of loss from the activities on the property owner. [23] See Berry v. Commissioner,T.C. Memo. 1978-65, affd. 622 F.2d 270 (6th Cir. 1980). *433 Implicit in petitioners' service contract argument is the claim that control of the publishing activities remained with Red Falcons. The agreement, however, evinces an abdication of control by Red Falcons. The literal terms of the agreement could not more clearly demonstrate a surrender of publishing activities. Pursuant to the agreement, Red Falcons transferred to Pinnacle the exclusive rights to publish and sell the book throughout the world for the duration of copyright. In exchange, Red Falcons received an advance royalty of $ 10,000 and the right to receive 10 percent of gross receipts from Pinnacle's sales after offset by the advance royalty. Pinnacle, as the transferee of exclusive rights, was free to use these rights to the exclusion of others, including Red Falcons. Exclusivity, by its very nature, belies any control by Red Falcons over the publishing rights transferred to Pinnacle. In a sense there is a modicum of control to the extent that Red Falcons negotiated the publishing agreement and specified that Pinnacle perform certain obligations, e.g., to publish the book without material changes in content and to commence distribution by a certain date. However, *434 it is not enough to show that the agreement imposes duties or obligations. [24] Rather, there must be some indication that Red Falcons retained control of a continuing nature over the performance of the obligations or over other business operations of Pinnacle. Viewing the agreement in a light most favorable to petitioners, we have determined that the terms of the agreement are sufficient to raise an inference that Red Falcons may have retained an ownership interest in the underlying copyright. However, it does not follow that the terms of the agreement are sufficient to support an inference that Red Falcons retained the right to direct or participate in Pinnacle's publishing operations. With respect to the risk of loss we see no need for a prolonged discussion. It is readily apparent from the agreement that Pinnacle was at risk in publishing the book. Under the agreement, the operational *435 expenses of publication were borne by Pinnacle and there were no provisions for reimbursement by Red Falcons for normal publication expenses. This allocation of risk is incompatible with the notion that the agreement is a service contract since there is no guarantee of remuneration for Pinnacle's efforts. See Berry v. Commissioner, supra.
In sum, we find that the terms of the publishing agreement between Red Falcons and Pinnacle does not support petitioners' interpretation. While the agreement is not free of ambiguity, the ambiguity lies in discerning whether Red Falcons retained any proprietary interest so that the transaction can properly be characterized as a license and not a completed sale. Drawing all inferences in petitioners' favor, the best we can do is acknowledge that there is a possibility that Red Falcons may have retained an ownership interest in the underlying copyright. As we have noted, our purpose in this proceeding is to identify the material issues of fact. Until we are satisfied that there are no unresolved issues of fact, we will not characterize the relationship between Red Falcons and Pinnacle as a matter of law. Nevertheless, in light *436 of the time and effort that has been expended by both the parties and the Court in addressing this motion, we find it necessary to eliminate the arguments which are wholly without foundation. Our authority pursuant to Rule 121 includes "specifying the facts that appear to be without substantial controversy." Rule 121(c). Accordingly, an order will be issued finding as a fact that the agreement, by its terms, does not create a service or management contract. Appropriate orders will be issued.
Footnotes
1. These cases were assigned pursuant to sec. 7456(d)(4) of the Internal Revenue Code of 1954↩ (redesignated sec. 7443A(b)(4) by sec. 1556 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 1755). All Rule references are to the Tax Court Rules of Practice and Procedure. 2. All section references are to the Internal Revenue Code of 1954, as amended, and in effect during the years at issue. ↩
3. A fourth issue, involving the period of limitations for assessment and collection, was raised by the motion. However, the issue was subsequently conceded by petitioners. See paragraph 4 of petitioners' Objection to Respondent's Motion for Partial Summary Judgment filed on June 13, 1983. ↩
4. The Red Falcons↩ is a novel portraying a Muscovite assassination team, whose basic mission is to carry out the death sentence imposed in absentia on former Nazis living in the United States. *. 9A./at any time without restriction. ** 9B./at any time without restriction. ↩
5. We observe the agreement was executed on October 1, 1976, but specified that distribution be commenced "in September 1976, time being of the essence." ↩
6. A ruling in respondent's favor would require the calculation of gain or loss. But more important, respondent explains, a favorable ruling would require that Red Falcons' copyright basis be reduced by the portion allocable to the sale of the print rights. The reduction in basis would, in turn, reduce Red Falcons' depreciation reduction. We observe that the record is entirely silent as to the value the parties ascribe to print rights or the percentage of basis allowable to print rights. ↩
7. We observe that venue on appeal of these cases would lie in the United States Court of Appeals for the Third Circuit. ↩
8. Fields v. Commissioner,14 T.C. 1202 (1950), affd. 189 F.2d 950 (2d Cir. 1951), was decided at a time when a number of courts still ascribed to the historical view that a copyright by its nature was indivisible. Further, the preponderate view of courts adopting the divisibility theory was that a copyright was divisible but only to the extent the Copyright Act recognized exclusive, segregated rights. See 14 T.C. at 1210, for a discussion of the leading cases adopting this view. Thus, courts recognized that printing rights and movie rights (separate media of publication) could be separately sold or licensed. Under the prevailing judicial analysis it was unclear, however, whether the transfer of a subdivision of exclusive rights would be treated as a sale. We note that the Copyright Act was amended in 1976 (generally effective January 1, 1978) and provides at sec. 201(d) that each of the five rights comprising the copyright may be subdivided indefinitely, and each subdivision may be owned and enforced separately. Sec. 201(d) is the first explicit statutory recognition of the principle of divisibility of copyright. Sec. 201(d), Pub. L. 94-553, Title I, sec. 101, 90 Stat. 2568; see H. Rept. 94-1476, Notes of Committee on the Judiciary (1976). However, the cases before us must be decided with reference to the Copyright Act of 1909 as amended and in effect for 1976; thus, we follow the principle of divisibility and guidance established by case law interpreting the Copyright Act of 1909. ↩
9. See and compare Schmitt v. Commissioner,30 T.C. 322 (1958), affd. 271 F.2d 301 (9th Cir. 1959), where transfer of exclusive franchise held not a sale when document contained provisions which in combination resulted in retention of substantial rights. While Schmitt involved the franchise of patent rights and not copyright, the case illustrates the approach we have taken in addressing whether or not substantial proprietary rights have been retained. See our discussion at p. 21, infra.↩
10. In Schmitt v. Commissioner, supra↩ at 332, the taxpayer retained the power to forbid any assignment of franchise rights. We stated, "Such sweeping control over one of the most important aspects of property ownership -- the right to sell or dispose -- is hardly consonant with the position that petitioner had sold all of his substantial rights * * *." 11. See our discussion at p. 16, supra.↩
12. To rule in respondent's favor on this issue would require that we resolve factual inferences against petitioners' interest. We can not do so by summary adjudication. See Shiosaki v. Commissioner,61 T.C. 861, 862↩ (1974). 13. The case was decided after a trial on the merits. ↩
14. Petitioners contend the intent of the parties to the publishing agreement was not to transfer ownership rights. The affidavit of the general partner is submitted to prove intent, and petitioners contend the course of conduct subsequent to the execution of the agreement will show that no sale occurred. Finally, petitioners argue the agreement constitutes a service contract as a matter of law. We note the affidavits submitted in support of petitioners' arguments are wholly conclusory, and that there is no factual support for petitioners' contention regarding course of conduct. Nevertheless, we have determined that summary adjudication does not lie since the agreement itself creates inferences of fact which in this proceeding we must resolve in petitioners' favor. We will address petitioners' service contract theory later in this opinion. ↩
15. Cf. Green v. Commissioner,83 T.C. 667 (1984). In Green we granted respondent's motion for partial summary judgment that exclusive license agreements continuing for the duration of the patents' terms effected sales of the underlying inventions. As in our case, respondent in Green relied on the express terms of the license agreement to support summary judgment. Contrary to our case, the taxpayers in Green agreed that the provisions and statements contained in the license agreement embodied the full intent of the parties to the transactions and the Court expressly found the license agreements unambiguous. 83 T.C. at 680, 681↩. 16. Respondent's position on this issue is embodied in Rev. Rul. 7-397, 1977-2 C.B. 178↩. 17. As in effect in 1976 and 1977, the taxable years at issue, sec. 465 provided in pertinent part: SEC. 465. DEDUCTIONS LIMITED TO AMOUNT AT RISK IN CASE OF CERTAIN ACTIVITIES. (a) General Rule. -- In the case of a taxpayer (other than a corporation which is neither an electing small business corporation (as defined in section 1371(b)) nor a personal holding company (as defined in section 542)) engaged in an activity to which this section applies, any loss from such activity for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk (within the meaning of subsection (b)) for such activity at the close of the taxable year. * * * (c) Activities to Which Section Applies. -- (1) Types of Activities. -- This section applies to any taxpayer engaged in the activity of -- * * * (C) leasing any section 1245 property (as defined in section 1245(a)(3)), * * * "Section 1245 property" (as defined in sec. 1245(a)(3)) includes personal property which is or has been property of a character subject to the allowance for depreciation provided in sec. 167. Sec. 1.1245-3(b), Income Tax Regs.↩, clarifies the term "personal property" which expressly includes intangible personal property. 18. Respondent has not conceded or abandoned his sale argument.↩
19. Exhibit 2 shows copies of a deposit slip for $ 7,500 dated January 10, 1977, in addition to the check dated December 29, 1976. ↩
20. If petitioners' answer can not be so construed, then it constitutes an evasive or incomplete response within the meaning of Rule 104(d). Respondent's admission request was clear and straight-forward. In the circumstances of this case, we would, alternatively, treat the response as an unjustifiable failure to answer and deem the matter admitted. See Rules 90(e) and 104(d). ↩
21. Rule 121(c) states: (c) Case Not Fully Adjudicated on Motion: If, on motion under this Rule, decision is not rendered upon the whole case or for all the relief asked and a trial is necessary, the Court may ascertain, by examining the pleadings and the evidence before it and by interrogating counsel, what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It may thereupon make an order specifying the facts that appear to be without substantial controversy, including the extent to which the relief sought is not in controversy, and directing such further proceedings in the case as are just. Upon the trial of the case, the facts so specified shall be deemed established, and the trial shall be conducted accordingly. ↩
22. See page 22, supra.↩
23. We have previously addressed the control and risk of loss tests in the context of distinguishing leases from management contracts. These cases illustrate the analysis we have followed in characterizing an arrangement as a master-servant or agency relationship. See, for example, Amerco v. Commissioner,82 T.C. 654 (1984); Bliss v. Commissioner,T.C. Memo. 1985-612; Meagher v. Commissioner,T.C. Memo. 1977-270↩. 24. The fact that the agreement obligates Pinnacle to perform certain duties does not require that it be treated as a service contract for Federal tax purposes. Rare is the contract, whether it be a contract for sale or contract for license, that does not specify the performance of duties. ↩